MISSISSIPPI SOCIETY OF ARTS AND SCIENCES *v.* H. MUSGROVE, Auditor, &c., and W. H. VASSER, Treasurer, &c., 44 Miss. R., 820.

## LOTTERIES.

The clause of the constitution forbidding states to pass laws impairing the obligation of contracts should be read and considered in connection with the ancient principles of the common law. Brewster v. Kitchell, 1 Salk., 189; Ld. Raym., 317.

Not all legislation which may, incidentally, have the effect to impair contracts, is obnoxious to the constitutional prohibition. Illustrations given of the exceptions which may be upheld, with the limitations which must be enforced.

The constitutional prohibition, being addressed to the "state," applies as much to the framers of a state constitution as to a legislature.

The legislature may take away, by statute, what has been given by statute, unless rights under it have vested. This rule illustrated.

A lottery grant is repealable except when contracts have been made or rights vested as between the grantees and others, which a repeal would infringe.

There seems to be no disagreement in the authorities that, if no consideration has been paid for a license, it is open to repeal.

Whether the prohibitory clause in favor of contracts can ever be allowed to affect the power of the state to enact police regulations for the protection of health and morals; and, whether on account of their pernicious and demoralizing influence in the community, lottery companies who have paid a bonus may not still be included in the repealing power, *quære.*

If plaintiff had even made formal tender of full performance of all the conditions precedent to the enjoyment of their franchise before the repealing laws took effect, these repealing laws would have swept away their franchise, because no contract had been perfected, and no right vested before the business became unlawful.

It seems, *passim,* that lottery enterprises should be regarded as of evil and demoralizing character and tendencies.

Error to Hinds circuit court. BROWN, J.

Plaintiff in error assigns error as follows:

1st. The court erred in its judgment overruling petitioner's demurrer, refusing the *mandamus* and dismissing the petition.

NOTE.—This, though not strictly a criminal case, has an immediate application to prosecutions under the recent laws prohibiting lotteries in Mississippi and other states. This is deemed a sufficient reason for giving it a place among the other State Cases.—EDITOR.

*Shelton & Shelton*, for plaintiff in error.

In their answer to the petition, the auditor and treasurer set up no other reason against the peremptory *mandamus* except the constitutional prohibition and the act of the legislature.

We do not controvert the principle that a state may, by legislation, repeal or alter the franchises of a municipal or political corporation, nor shall we controvert that position as applicable to a corporation created only for the state's advantage.

On the other hand, we shall take it for granted that the charter of a private corporation for trading purposes is a contract, the obligations of which, under the constitution of the United States, cannot be impaired by a state. 4 Wheat, 514; 16 How. U. S., 369; 18 How. U. S., 331.

But, between these two classes of corporations, there is a third class in which the corporation is for trading purposes, but from which the state or public receives some benefit or advantage. In such cases the state's power over the charter after it goes into effect, does not extend beyond the right to repeal, release, or abrogate the provision made in the charter for the benefit of the state or public. It does not extend to an abrogation either by a general repeal or special abrogation of the charter franchises granted to the corporation as a company. Nor can the state repeal the charter *in toto*, because by such repeal the franchises conferred by said last-named sections would be abrogated. But in this case it is not a question of repeal of the entire charter, but only as to the abrogation of the more reliable franchise contained in the charter, to wit: that granted by the fifth section, leaving to the company its existence with all other franchises that incumbered it with the obligations of the seventh section. The abrogation of the lottery franchise neither repeals the charter nor destroys the corporation; it only deprives the corporation of that franchise by which they mainly expected to make the capital stock invested by them profitable, and without which franchise the corporators would never have invested their money.

The foregoing positions are simple, and within the well-defined law of contracts. The statement of them is, " on prin-

ciple" alone, argument enough; but we will refer to the authorities.

Though the state or the public may derive benefit from the corporation, yet if "the whole interest" does not go to the state or public, the corporance is private.   Angel & Ames on Corp., §§ 31, 36, 767.

If the stock is owned by private persons, the corporation is private, though the use may be public.   Angel & Ames on Corp., §§ 31, 36, 340.

The material question then is, did the charter take effect as a contract before the constitutional provision against lotteries was adopted?

It will be remembered that the charter had been adopted, accepted by the corporation, organization had under it, and the $5,000 tendered and refused, months before the constitutional prohibition was adopted.   Now, that charter was granted to "two particular persons by" name (as corporators), "their associates and successors;" these were then, from the beginning, corporators in being as such.   By the terms of the charter, the corporators are "hereby declared to be a body corporate, under the name of 'The Mississippi Society of Arts and Sciences.'" The franchises are conferred without condition or postponement, and the right to them created then and there *in presenti;* and the act expressly provides that it shall take effect from and after its passage.   Now, an act incorporating certain "named persons," and such other persons as may be associated with them, confers on the persons named "at once" the franchises of a corporation.   2 How. S. C. R., 278.

It was, therefore, a corporate body from the time of the adoption of the charter.   It may possibly be said, that there is no proof of an acceptance at the time by the corporators named in the charter.   "A charter is presumed to have been granted at the instance of the persons named in it, and to have been accepted by them, and it requires proof to relieve that presumption."   5 Cranch C. C. R., 632.

But in this case, it would create no difference, if we were to concede that the corporation was not in being until "actual acceptance proved;" first, because we aver immediate acceptance,

and it is not denied; second, because the organization occurred, and the $5,000 were tendered before the constitutional prohibition. Whether, therefore, "the existence of the corporation" is to be dated from the date of the charter, or from the time that charter was actually used by the corporators as provided, or had existence and was a corporation in being under its charter before the constitutional prohibition; that prohibition, therefore, in it abrogated the lottery franchise contained in the fifth section of the charter; impaired the obligations of the charter contract in a franchise most useful, for the purpose of making the capital stock invested by the corporators profitable to them.

If it be insisted that the charter was a conditional proposition, and was not to confer any rights on the corporators until the $5,000 should be paid into the treasury, and that the state had the right to withdraw her proposition at any time before that payment, I answer, that the charter is not made to depend on any condition precedent; nor is any condition subsequent made to operate a forfeiture of it. The charter provides that before commencing business the company shall pay into the state treasury $5,000, and thereafter annually one-half of one per cent. on the sale of tickets. Now that, if a condition at all, is not a condition precedent to the charter taking effect, but only a condition precedent to commencing the business authorized by the charter, by a corporation in being. Now, the corporate body could not make a payment before it had its existence. It is, therefore, apparent that if it be a condition at all, it is a condition precedent to the commencing of business, and not a condition precedent to the existence of the charter, or the corporation. But, if it were otherwise, it would create no difference; for, if it be true that the state legislature had created a charter to take effect only on payment of $5,000 by the corporators to the state, only the legislature could, before payment, withdraw or repeal the charter; the auditor and treasurer had no such power of either withdrawing or repealing the charter. It was only their duty, so long as the law was in existence, to obey it and take the money. When, therefore, it was tendered to them, and they refused to accept it, the corporation had performed the

condition precedent, and their franchises, even under this view of the question, became vested. It was not until after that tender that the constitutional prohibition was passed. But the payment of the $5,000 was not a condition at all. It is simply a legal requisition, creating an indebtedness by said corporation from the moment that the charter was accepted, and to be paid before commencing business. The corporators must either refuse the charter or pay the $5,000, and also the annual tax. There is neither condition to nor defeasance of the charter contained in the section, but simply a requisition on a corporate body in existence.

The $5,000 clause is not in the form of a condition. It is not even a proviso to the charter, or to any franchise conceded by the charter, but is an independent section creating two liabilities, to wit: the $5,000 before commencing business, and the half of one per cent. annually afterwards. If the company had commenced business without paying the $5,000, the state's remedy would be plain by *quo warranto*, not to test the existence of the charter, but only to arrest the commencing of business under the charter, until payment of the money.

But I may be told that dealing in lotteries is immoral and *contra bonos mores*, and, therefore, the state had the right to prohibit them. That might be a good argument if the right was not created as a charter contract between the state and the corporation; that is, if it did not come under the protection of that clause of the United States constitution which prohibits the state from impairing the obligation of a contract. But it will not do to say that the state may at one time make a valid charter contract, granting a particular franchise, and after it has taken effect as a valid contract, immediately on the ground that the franchise is against morality, abrogate the franchise, which constituted perhaps the greatest inducement on which the corporators accepted the contract. The state has the clear right to prohibit any more such contracts, but not to annul or impair the obligations of one already made. A legislature might conclude that all banks, or all railroads, are *contra bonos mores*, and abrogate the banking or the railroad franchise, and so of every other corporation.

But an argument will doubtless be founded on that clause of the charter which declares the purpose and object of the charter to be for the benefit of common schools of the state. See last clause of section 1.

Now that benefit is really measured by the charter itself. It is confined to two items. 1st. The $5,000 to be paid " before commencing business." 2d. The annual tax or bonus of one-half of one per cent. on the sale of lottery tickets. Subject to these, the corporators are the only stockholders, and furnish all the money; they are entitled to the benefit of every franchise granted by the charter for the purpose of making profit on their capital stock invested, and own, as a corporation, all the property that may be accumulated, and are liable to all the acts created.

A single principle will put this question to rest even; public and municipal corporations may stand in respect to franchises granted to them by the state on the same footing as would any individual or private corporation. If the powers conferred be granted exclusively for public purposes, they belong to the corporation in its public and municipal character; but if for purposes of private advantage, though the public may derive benefit therefrom, the corporation *quoad nos* is to be regarded as a private company. Angel & Ames on Corp., 33; 2 Hill, 531.

Another principle is also decisive of this question.

A hospital, a college, or other public school, founded by private benefaction, is a private corporation, although, by its charter, it may be dedicated to public use. Angel & Ames on Corp., 34; 2 Kent, 222; 4 Wheat., 668; 1 Sumner, 276; 3 Ga., 283; 13 B. Monroe, 642.

In this case all the capital invested is the capital of the corporators; the state invests nothing. All the property is to be owned by the corporators, all the profits (except the two bonuses) are theirs. All the franchises are granted to them to enable them to make profit on their capital stock invested. Although it be true that common schools is a public institution, aid to which may have constituted the object of the legislature in granting, and of the corporators in accepting the charter, yet since the charter measures the benefit to that institution by two

money bonuses from the corporation, and recognizes all other benefits as belonging to the corporation, and grants the lottery and other franchises for the purpose of enlarging those benefits, then these franchises come under the first principle above quoted, and, *quoad nos*, the corporation is to be regarded as a private company.

Again, regarding the object as a public one, under the second principle above quoted, it is still a private corporation, the plain result of all which is, that the control of their own money and the use of the corporate franchises to make it profitable for the public purpose to the extent specified in the charter, whether wholly or in part, was a part of the charter contract upon which they invested their money, and without which they would not have invested it for the public purpose, and therefore neither the money nor the franchises could be taken from the company by the state without violating the obligations of the contract.

Upon the foregoing principles, the state had no power either through her constitutional convention or her legislature, to abrogate the lottery franchise after the charter had been accepted by the corporators, and, therefore, the *mandamus* should have been granted.

*J. S. Morris*, attorney-general.

The two rules—that every pleading must be taken most strongly against the pleader—and that every demurrer must relate back to the first substantial defect in the pleadings—being applied to this case, the petition was properly dismissed, and there is no error in the judgment of the circuit court.

The petition is itself defective, in that it claims " a vested right " under a contract implied by a charter to set up and carry on a practice deleterious to sound morals.    Lotteries have been so characterized and treated by the laws of this state for fifty years.    Rev. Code of 1857, 597 ; Hutch. Code, 945 ; Act of 1822, Poindexter's Code, 326.

There can be no vested right, under contract or otherwise, to do wrong or violate good morals.    Baugher v. Nelson, 9 Gill (Md.), 309 ;  Satterlee v. Mattheson, 16 Serg. & R. (Pa.), 191.

Contracts *contra bonos mores* are void. 4 Campb. 152; 1 B. & Ald., 683; 16 East, 150.

The petition is defective, because it does not show that petitioners have, but, on the contrary, shows that they have not, complied with the terms of their charter. It not only fails to show that they are not themselves in default, but it admits that they are. 1 Freeman's Ch. R., 357.

For example, though it claims in general terms that "said association is organized," it does not even pretend, in any terms, that the corporators, Lindsey, Smith, and "their associates and successors," or any or either of them, or their agents or attorneys, proxies or assigns, organized said association, or participated in or consented to its organization, or to the appointment of its pretended agents, or the employment of any attorneys, or even to the institution of this suit. It does not pretend that there was ever a meeting of the corporators held or called, nor state when, where, how, by whom, or upon what (if any) notice to members or to stockholders, said pretended organization took place. And all these matters are of vital importance. See Acts of 1866–7, 403; Rev. Code of 1857, 291, art. 4.

The *time* of the organization is important to the state, because the president and directors, by the terms of section 2 of the charter, are to hold their offices for one year from the date of the election; and by the 7th section, the iniquity is to continue for twenty years from its organization.

The *place* is essential, because a private corporation whose charter has been granted by one state, cannot hold meetings, pass votes, and exercise powers in another state. Angel & Ames on Corporations, 80, § 104 (8th edition).

The *mode* by which it was organized is important, because by principle it should have been by a vote of the company, by deed and under seal. Angel & Ames on Corp., p. 89, § 112; ib., p. 97, § 126; ib., § 232; ib., §§ 489, 490, 491, 492, 493, *et seq.*

And the *notice* upon which, and persons by whom such organization and election took place, is extremely important to the state in a case like this; not only for the prevention of

fraud as respects the rights of the corporators, but to prevent the state from being imposed upon by an unlawful transfer of the franchises conferred by the charter, which, it is open and notorious, has occurred in this very case.

But the petition is defective, not only in its total failure to make the necessary and indispensable averments and exhibits of the plaintiffs' compliance with the terms and conditions of the charter, and of their right to sue, but also in negativing, as it does in palpable terms, the payment of the $5,000 into the state treasury, and the execution of the bonds required. True, it says the amount was "tendered;" but it avers, and proves by its exhibits, that because of military interference, the money was not received. But it is to be observed, that this was two years and eight months—an unreasonably long time—after the date of the charter, when the state authorities, having every reason to suppose from the lapse of time and non-user of the franchises proposed, that they would not be accepted, had already framed and was about submitting to the people the present constitution, containing a prohibition against this species of immorality. And it is totally immaterial whether the military commandant had any rightful authority to interfere or not. The petition shows that he did interfere, and that, whether he had the lawful authority or not, he certainly had the power to induce both the treasurer and the party tendering the money to stop, and finally to yield, and that they did yield, and the money was in fact not paid. If it was unlawful for the treasurer thus to yield to military interference, it was equally unlawful for the party tendering the money to do so. They all yielded —as much on the one side as on the other—for the petition shows that the money was never again tendered at the treasury. Why was not the matter pursued in the courts then? The state did not pursue it, because she was not aggrieved. She was willing that the inchoate lottery, with all its disinterested "benefits to schools," should perish and never ripen into vitality. She was not in any respect responsible for the military interference; but she had no disposition and no interest to resist that interference. She was anxious then, as she is now, that the negotiations, commenced in an evil day, should remain

*in fieri*—in the form of an unaccepted offer, on her part, to grant an immoral franchise, but upon terms as yet uncomplied with; and that the other party to the negotiations should remain in a state of hesitation and default, until she should be in a condition lawfully to withdraw her offer by a practical repeal of the nefarious charter.

But the petition being thus liable to demurrer, and palpably defective, in not averring payment of the money, is, if possible, still more so, in admitting, as it does, that petitioners or their pretended president and directors have never given, or even tendered to the treasurer for his approval, any bond and security, conditioned for the faithful performance of their duties as required by section 8 of their charter. Acts of 1866–7, p. 406.

And, regarding the transaction between the state and petitioners in the theory of a contract, there is an utter absence of any pretence to that mutual and contemporaneous consent which is the soul of all valid contracts. The state, by an act of her legislature (or that which passed for a legislature), consented, or offered her consent, at one time. But when did the other party consent? Two years and eight months afterwards, when the state was under duress of military control—when a military officer presided in her executive office, and another military officer in her treasury; when the people of the state had framed, and were preparing to submit to the people at the ballot-box, a constitution forever withdrawing her unaccepted offer. Then it was, petitioners allege, that they made the first and only expression of a willingness on their part to comply with any of the several conditions upon which the franchises named in the charter were to be theirs; and that the acceptance of the part tendered was prevented, not by the voluntary action of the state or any of her officers, but by military interference.

For this interference petitioners would have it believed that they are in no way responsible. Certainly they are not. Neither is the state. It was the interference of a power almost as much beyond the power of resistance by the state as by the individuals claiming the franchise. But like much of the mili-

tary interference of which complaint is so often made, this interference was most salutary, and may yet prove the chief means for preventing the establishment, under the disguise of a false and fraudulent name, in every city, town, village and neighborhood in the state, for twenty years, of a most pernicious and despicable vice.

The lottery scheme remaining thus unaccepted by the schemers, and all the reciprocal conditions upon which it was to become a vested right in the corporation, being wholly unfulfilled, partly by the intervention of the military commander, and partly from neglect or inability of the corporators to organize the concern and give the bonds required by their charter, the new constitution with its prohibitory clause against this species of vice, was adopted and became part of the organic law.

Thus, the proposition of the state, if it ever was legally made, was distinctly and absolutely withdrawn before its acceptance, before it had acquired any legal form, and before any right to the franchises named in the charter vested in the corporators. And all these facts and deductions are made clearly and palpably to appear by the petition itself, and are the first defects in the record, and to these, according to the rule, the demurrer of the petitioners must first attach.   See 1 Chitty's Pl., 668. And being palpable on the face of the petition or clearly deducible from it, they are, if possible, stronger and more fatal to petitioners than if they had appeared in any pleading on the side of the state, or of its officers who are sued.   Gould on Pl., 153.

Mr. Benjamin, in his works on Contracts of Sale, has made, in one chapter, a collection of English and American cases, illustrating the universally admitted right of one party to negotiations to *withdraw* an offer to contract, at any time before its final and complete acceptance by the other.   See Benjamin on Sales, 28, *et seq.*

But there is one feature of the charter from which it might very properly be adjudged to create a public, and not a private, corporation.   The latter clause of section 2 expressly declares that the purpose and object of this charter is for the benefit of

the Common Schools of the state of Mississippi. And although this declaration may be, and probably is, false, and intended to disguise the real design of the charter, the petitioners in this proceeding are especially precluded from denying the truth of anything contained in their charter, because it is a part of their case. Revised Code of 1857, 249, art. 83 ; ib., 516, art. 224 ; 6 Cranch, 144.

But if it be true that " the object " and " the purpose " of the act was " for the benefit of common schools," can it be doubted that it is for the state, who is the guardian of these schools, and not the corporators, who are the mere agents of the public object intended, to judge and determine of the propriety and wisdom of abandoning and annulling this, and adopting other and different means for promoting that object ? Gutzweller v. The People, 14 Ill., 142 ; Butler et al. v. Pennsylvania, 10 How., 402. But whether this proposed lottery be a public or a private corporation, or its object be to benefit " arts and sciences," or " schools," or only to plunder the public and debauch the public morals, in order to enrich the owners of a lottery, the completion and continuance of the scheme in this state, is a question which the constitution-making and law-making power is to decide, as it may all other questions of police, or of protection to the public morals or public order. Ohio & Mississippi R. R. Co. v. McClelland, 25 Ill., 142-5 ; Vanderbilt v. Adams, 7 Cowen (N. Y.), 349 ; Hirn v. The State, 1 Ohio, 15 ; Toledo Bank v. Bond, ib., 622 ; The State v. Phalen et al., 3 Harrington (Del.), 441 ; Freleigh v. The State, 8 Mo., 614 ; State v. Hawthorn, 9 ib., 389 ; Presb. Church v. City of N. Y., 5 Cowen, 538 ; Gregory v. Shelby College, 2 Metc. (Ky.), 589 ; Toolusane v. Sedgewick, 15 Cal., 515 ; Barber v. Gregory, 31 Conn., 264 ; People v. N. Y., 32 Barb., 102 ; State v. So. R. R., 24 Texas, 80 ; State v. Jones, 6 Wisc., 334 ; Bishop's Fund v. Ryder, 13 Conn., 87 ; Oriental Bank v. Freeze, 6 Shep., 109 ; Phalan v. Va., 8 How., U. S. S. C., 163 ; Gorman v. Pac. R. R., 26 Mo. (5 Jones), 450.

These cases illustrate the general and undeniable right of the states to limit the principle of vested rights under charters, licenses, and contracts, in all cases, so far as may be necessary

to preserve, absolutely, the morals and policy of the states, and keep their police power over the community forever free. Many of the cases cited were lottery cases; and the disfavor with which this species of enterprise is regarded by the courts as being in violation of good morals, is apparent in them all. In none of these cases was there any dispute about the act of incorporation having been accepted, and the transaction being completed in its organization under the law. And yet the right of the state to control or annul them is generally maintained.

At the time of the adoption of the constitution of 1868 by the people, and its approval by congress, this supposed contract remained *in fieri,* in the shape of negotiations tending towards, but never having reached the condition of a valid contract. Partial performance of conditions had been attempted, but wholly failed. Full performances had never been attempted or pretended. Money had been offered, but not paid in. The bonds had never been prepared or offered.

Thus the matter remained, and thus it still remains—inchoate and incomplete. The very assumption set up in this proceeding that something more is necessary to be done by the state or its officers, is an admission that it was never completed, and that as yet no rights have "vested." If this were not so, why do not the petitioners proceed with their enterprise, and repose, as they might well do, upon their tender of performance?

This application came too late. The constitution and laws which the present state officers are bound to obey, having not only annulled this charter, but stamped the strongest reprobation upon every species of lottery, it is clear that these officers can do no act in their aid. No money can now be accepted or received by any officer of the state for that purpose. All "aid" or "connection therewith" is positively prohibited, not merely to public officers, but to all other persons in the state, under penalty of fine or imprisonment. If these petitioners have had fully vested in them this constitutional right, independently of the present constitutional and statutory regulation, why apply to the state, to its officers, or to courts, for aid and assistance? What is it to the petitioners that the auditor and treasurer refuse to receive five thousand dollars, or to take, approve, and

file bonds? The state, who fails to receive the money or the indemnity, might have the right to complain, and sue out process to compel her officers to perform these acts. But the petitioners, being in the uninterrupted enjoyment of their vested rights, are not injured, and have no reason to complain. But the desire to create rights which have not vested, and which can only vest on the payment of the money and the execution of the bonds, is a confession that they have not already vested. It is a confession that in this admitted state of facts, and in the face of existing prohibitions and penalties, they dare not commence to do business. Their boasted rights and franchises are only in the bud and flower, and cannot, without some further act of the state, ripen into fruit. The law says " let them perish in the flower ! "

Simrall, J. :

This is a proceeding by *mandamus*, instituted by the plaintiff in error, a corporation created by act of the legislature of 1867, to compel the treasurer to approve the bonds of the president and directors, and to compel the auditor and treasurer to receive into the state treasury five thousand dollars.

The answer of these officers set up that they declined to accept the money and approve the bonds, because the charter of the plaintiffs conferred upon them a franchise to conduct and carry on lottery schemes, and to deal in and sell tickets therein, which is prohibited by the revised constitution, and also by the act of the legislature of 1870. To the answer the plaintiffs demurred. The court held the answer sufficient in law, and dismissed the petition.

The conditions precedent, which must be fulfilled before a right to utilize the franchise inures to the incorporators, are: The payment into the state treasury of five thousand dollars for the use of common schools, and the approval, by the treasurer, of the bonds of the president and directors.

An offer to pay the five thousand dollars into the treasury was made the 18th of October, 1869 ; but at that time no bonds were presented for approval. On the 2d of May, 1870, a letter was addressed by the plaintiffs to the auditor and treasurer,

reciting the former tender of the money, and expressing a readiness then to comply with the conditions of the charter, by payment of the money and exhibition of bonds for approval, and proposing to comply with all the terms precedent to their right to begin business. No response was made to these proposals; but, prior thereto, the constitutional prohibition, as well as the act of the legislature against drawing lotteries or selling tickets, had gone into effect, and annulled the lottery feature of the plaintiffs' franchises; unless, as is contended in their behalf, it is void as to them, because it impairs the obligation of the contract between the state and themselves, as embodied in the charter.

It was settled in the case of Dartmouth College v. Woodward, 4 Wheat., that the "contract" which a state may not impair may as well be contained in a charter granted by itself, or by the proper authority, during the colonial period, as the private agreements of individuals with one another. As yet the judiciary have not been able to define any definite rule by which legislation impugned as conflicting with the constitutional prohibition may be tested. It may be impossible to do so. The constitution on this subject ought, in many cases, to be read and considered in connection with an ancient principle of the common law, which is thus stated, Brewster v. Kitchen, in 1698, reported in 1 Salk.: "If A covenants not to do an act or thing which was lawful to do, and an act of parliament comes in after and compels him to do it, the statute repeals the covenant. So if A covenants to do a thing which is lawful, and an act of parliament comes in and hinders him from doing it, the covenant is repealed." It would be safe to say that all legislation which has the effect of impairing the contract, is not obnoxious to the constitutional prohibition. If the operation of the statute be but incidentally to impair the contract, when it is passed with reference to a totally different subject, altogether *diverso intuitu*, it may be upheld. To illustrate, if a contract should be made to erect a wooden structure, in a densely populated city, and a statute should come in and forbid the building of such a house, it would be a case where the covenant would be discharged; this, by the policy of the law, would be to guard against conflagration by fire, and would manifestly be for the good

police of the town. Yet incidentally, it destroyed the obligation of the contract.

So, too, if a contract were made to build a house upon a certain spot of ground, and afterwards the legislature or competent municipal authority should lay out a public road over the ground, here the public convenience must yield or this contract be annulled.

If all legislation must fall under the condemnation of this constitutional prohibition, that might, and did incidentally, have the effect to impair the obligation of contracts; legislative control over internal police and morals would be so hampered and circumscribed as that its practical value would be seriously embarrassed. In Pres. Church v. City of New York, 8 Cow., 539, there was a covenant for quiet enjoyment, in a grant of the premises on the condition "that a church should be erected thereon, or they should be used for a cemetery ; " but for private secular uses. Subsequently the city prohibited the use for a cemetery. It was held that the city ordinance "repealed the covenant." The city had the right to ordain proper wholesome police regulations for the public health, and this private covenant must yield to the paramount public good. It may not be inappropriately said, that individuals must be considered as making their covenants and contracts subject to the contingent right in the state, within the just application of the principles we are discussing, of partial impairment, or entire abrogation.

But courts should carefully guard against pushing the doctrine beyond its reason. The prohibition is addressed to the state, and applies to all the forms that the state may employ as lawgiver, whether in convention framing organic law, or in its ordinary legislative capacity passing statutes.

If this charter were granted exclusively to subserve some public purpose, as to raise means to promote common schools, it would not, within the intent of the constitution, create a contract between the corporators and the state. But the legislative power would be complete. Either to amend or abolish the corporation would be but the instrumentality to accomplish a policy. Although the first section declares that the object of

the charter is for the benefit of common schools, there is coupled with it a right to make private gain. The $5,000, and one-half of one per cent. on the sale of tickets, to be paid into the state treasury for common schools, is the consideration upon which the corporation is permitted to draw lottery schemes, they retaining all else as their share of the profits. The mere enactment of the charter does not constitute a contract. The state says, in the charter to the corporators, "organize by the election of officers, execute the bonds to comply with its injunctions, pay into the state treasury the $5,000 for the schools, and then you may begin business and use your lottery franchise." Upon compliance with these terms, a contract between the state and the corporators would have been consummated. Until complied with, there is no restriction upon the legislature resuming the franchises or forbidding their use.

The state may take away by statute what has been given by statute, unless rights under it have vested. If the legislature delegate authority, it can revoke it if nothing has been done under it which creates a vested right.

A pointed illustration is found in the C. & L. Railroad Company v. Kenton county, 12 B. Monroe, 148. The legislature had authorized Kenton county to subscribe to the stock of the company, upon an approving vote of its electors. A vote in favor of subscription and to impose the tax was had, but the county court refused to subscribe and levy the tax. The company applied for a *mandamus*, which was refused. An appeal was taken. Pending the appeal the law was repealed. The court held, that on the condition of facts before the inferior court, the *mandamus* ought to have been granted. But inasmuch as the county court had not made the subscription and levied the tax, no right had absolutely vested in the company before the law was repealed. Its judgment was affirmed.

If that doctrine is sound, as applied to a corporation, created to develop wealth and advance civilization, *a fortiori* must it be approved when invoked to shield the community from a project which is only evil, and that continually. Also McQueen v. Jones, Com'r, 6 Wisconsin, 334.

The authorities are abundant that the legislature may repeal

a lottery grant, unless contracts have been made or rights vested, as between the grantees and other parties, which would be infringed by the repealing law. Gregory's Executors v. Trustees of Shelby College, 2 Metcalf (Ky.) R., 598; State v. Hawthorn, 19 Missouri R. 391; State v. Freleigh, 8 Missouri R., 614.

There seems to be no disagreement in the authorities, that if no money or other consideration is paid for the license or grant, it is open to repeal by subsequent statute.

There are authorities that assert the doctrine that the prohibitory clause of the constitution does not affect the power of the state to enact general police regulations for the preservation of the public health and morals. It was said by Marshall, C. J., in Dartmouth College v. Woodward, " that the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions adopted for internal government."

On the ground, therefore, that lotteries were of pernicious and demoralizing influence in the community, some of the courts, without regard to the fact that the grantee had paid a bonus to the state, have supported the validity of repealing legislation. 3 Parson on Cont., 556, and notes.

But it is not necessary that we should go this far. In determining constitutional questions, the proper, and I think it the safer practice, is to confine ourselves strictly to the questions of law that arise on the facts of each case.

If the plaintiff had made a formal tender of the $5,000 to the treasurer, and had presented for his approval unimpeachable bonds, before the repealing laws took effect, these laws would have swept away his franchise; for it would not be predicated that a contract had been perfected before the business was made unlawful.

But the facts are by no means as full and strong as these. Before the prohibition of the constitution and statute, the plaintiff had done no more than to make his tender of the money in 1869. It was after the adoption of the constitution and prohibitory statute that the bonds and money were offered. Both the payment of the money and the execution of the bonds were conditions precedent to the enjoyment of the franchise.

The prohibitory laws have deprived the plaintiff of no vested right, nor impaired the obligation of a contract.

Wherefore, the judgment of the circuit court, denying a peremptory *mandamus,* is affirmed.