## HENRY H. MOORE v. THE STATE OF MISSISSIPPI.

1. LOTTERIES.—The policy of the state of Mississippi, even before the present constitutional prohibition, has always been against lotteries, prohibiting and punishing them as a species of gaming.

2. SAME—CONTRACTS—CONSTITUTIONAL LAW.—A corporation, authorized by its charter, on the payment of a bonus of $5,000 to the state, and on giving bond and security for the further payment of a certain per cent of its profits, to carry on the lottery business in the state for twenty-five years, is not protected by the constitution of the United States against the abrogation of its franchise, because lotteries, being injurious to the public morals, cannot be made the subject of a contract; and a chartered franchise to carry on lotteries, stands on a different footing from charters granted for any legitimate purpose.

3. VESTED RIGHTS—POLICE POWER OF THE STATE.—Authority to raise money by lotteries, or to sell spirituous liquors, are not protected by the prohibition in the constitution of the United States against impairing the obligations of contracts; it not being the intention of that prohibition to restrain the police power of the states in the preservation of the public morals.

4. CONSTITUTIONAL LAW—POLICE POWER OF THE SEVERAL STATES.—As to the supervision and control of internal police, the legislative power of the states is unaffected by that charge of the constitution of the United States, which forbids the states to pass " any law impairing the obligation of contracts." While the states may not repeal or materially alter charters to promote charities, eleemosynary institutions established by private means, and the like, their power is unrestrained over internal police, sanitary and moral; Dartmouth College v. Woodward, 4 Wheat.; and the state

cannot abnegate or surrender the duty which is perpetually upon it, to consult the physical and moral good of the people. Cooley Const. Lim. 596, cited and approved.

5. SAME.—A state, whether making organic law or passing ordinary legislative acts, cannot "infringe upon the inviolability of contracts;" but franchises or licenses which assume to allow that to be done in the state for a long term of years, which experience proves to be injurious to morals and a snare to the ignorant, such for example as a lottery company, is not a "contract" within the prohibition.

6. CASE AT BAR.—A lottery charter was granted by the legislature in 1867, to be enjoyed by the corporators for twenty-five years, upon the preliminary payment of a certain bonus and compliance of certain other conditions by them. The bonus was paid, and the conditions all performed by the corporators. The constitution of 1869 forbade all lotteries. The corporators, claiming that their franchise was a right vested by contract, continued its exercise, and their agent was indicted and convicted. The defendant brought error, and the judgment was affirmed.

7. CORPORATIONS—PRACTICE.—Where the question to be determined is whether a lottery charter granted before the present constitution was abrogated by the constitution, proceedings by, or information in the nature of *quo warranto*, to compel a forfeiture of the charter, need not be resorted to, but will be disposed of by indictment.

ERROR to the circuit court of Yalobusha county. NILES, J.

The opinion of the court contains a full statement of the case.

*Johnston & Johnston,* for plaintiff in error,

Filed an elaborate brief in this case, in which they make the following points:

1. That the constitution of this state, prohibiting lotteries, was adopted after the legislature of the state had granted the lottery franchise to the "Mississippi Agricultural, Educational and Manufacturing Aid Society," and when there was no existing constitutional prohibition of lotteries; that the act of the legislature, imposing penalties for carrying on lotteries, was passed after this society had been incorporated, and that, consequently, the corporation under which plaintiff in error sold lottery tickets had acquired a vested right, by contract with the state, which could not be divested by subsequent legislation without violating the constitution of the United States. They cited, on this point, Miss. Acts of 1870, p. 144; Const. Miss. art. 12, § 5;

Rev. Code Miss. p. 666; Miss. Legislative Acts 1867, p. 349; Const. U. S. art. 20, § 10. They called attention to the fact presented by the record, that the society referred to did not receive the lottery franchise as a mere gratuity, but paid a cash bonus of $5,000 into the treasury of the state, pursuant to the requirement of the act of incorporation, for the franchise, and had also, in good faith, paid a specific tax of $1,000 per annum and the percentage on sales of tickets specified in the charter, up to the time that their agent, the plaintiff in error, was arrested under the prohibitory act of 1870 for selling tickets.

They admitted that, in cases where no vested rights, under contract with the state, had accrued, and in cases where the legislative privilege to draw lotteries was gratuitous merely, and where no bonus was paid, the legislative power to repeal lottery charters was clear and unquestionable; but that this principle by no means applied to the case at bar; that lotteries were not evil of themselves, in contemplation of law, but become evils merely by legislative prohibition.

They contended, that all the adjudicated cases in reference to this question, and relied upon by the attorney-general, were made in cases where no bonus had been paid, but where the legislative grant was a mere gratuity; and that even in cases where the original grant was a gratuity, but where vested rights had accrued to others by virtue of an authorized sale of the corporate franchise to outside parties, pursuant to authority to sell contained in the act of incorporation, those rights were preserved by the courts and the charters upheld under the provision of the constitution of the United States prohibiting all legislation impairing the obligation of contracts. They cited and commented upon the following cases and authorities: Miss. Society Arts v. Musgrove, 44 Miss. 870; N. O. J. & G. N. Railroad v. Harris, 27 Miss. 517; Read & Co. v. Beall, Sheriff, 42

Miss. 472; Coulson v. Harris, 43 ib. 728; Aberdeen v. Sanderson, 8 S. & M. 663; 3 Pars. on Cont. 556; Phalan's case, 1 Rob. (Va.) 713; Phalen v. Virginia, 8 How. (U. S.) 163; Hearns v. State of Ohio, 1 Ohio St. 15; Baker v. Boston, 12 Peck, 184; Vanderbilt v. Adams, 7 Cow. 349; Coates v. Mayor of New York, ib. 585.

They argued that the cases cited by Mr. Parsons in his note (vol. 3, p. 556,) in support of the doctrine stated in his text do not, in their facts, support the doctrine of the learned author; that the following cases, referred to by Mr. Parsons as being in opposition to his views, contain the true rule in reason and analogy, viz: State of Missouri v. Hawthorne, 9 Mo. 389; Freleigh v. State, 9 ib. 606; the State v. Stirling, 8 ib. 697; State v. Phalen & Payne, 3 Harring. 441.

The same counsel for plaintiff in error referred to art. 12, sec. 15 of the Constitution of Mississippi, adopted after the charter was granted in the case at bar, which provides that no lottery granted before that constitution became operative, should be permitted to sell tickets or draw lotteries; and contended that that provision of our state constitution is violative of the constitution of the United States, which provides that no state shall pass any law impairing the obligation of contracts; that a state constitution is a law of a state, as fully as mere legislative enactment, in view of the aforesaid provision of the constitution of the United States, and that, as the franchise in the case at bar was granted years before our present state constitution was adopted, on the payment of a bonus of $5,000, and annual privilege taxes, it was not in the power of the framers of that instrument, by a retrospective provision, to put down lottery privileges granted as these privileges were, and at a time when no existing constitution or law of the state prohibited lotteries.

The counsel submitted, therefore, that the judgment

of the court below must be reversed; that plaintiff in error must be shielded from punishment, being guilty of no violation of law; and that the corporators must be protected under their charter contract with the state, having on their part complied fully with their part of the contract.

*Miller & Birchett*, on same side.

When the act incorporating the Mississippi Agricultural, Educational and Aid Society, was passed in A. D. 1867, there was nothing in the constitution of the state prohibiting lotteries, nor is the carrying on of lotteries defined and punished as a crime at common law, but is solely regulated by the laws of the several states, some permitting, others inhibiting them; and even if it could be shown to be a common law offense to set up lotteries, it is not of that heinous character which places it beyond the power of the legislature to regulate and control the subject, for while we may admit that any legislation legalizing bawdy houses, etc., being utterly subversive of law and order, are on grounds of public policy void, it by no means. follows that a scrupulous rule of morality makes all legislation void which does not conform to it, and that things only *mala prohibita,* can be attacked and held as void on any such assumption.

The legislation of the several states on this subject fully shows that they claimed and exercised the power of legislating favorably or unfavorably upon it; and we claim that it is for the legislature, and not the courts of the state, to define and establish the public policy of the state; and that when this company was chartered, the legislature had the undoubted authority so to do, and, if the act was unwise or improvident, upon them rests the responsibility. And the test to be applied is the same as in other cases. And if the act is not clearly unconstitutional and void, it should be sus-

tained. Suppose, before the new constitution of the state was ratified, and the act to carry the same into effect in relation to lotteries had been passed, an information by the attorney-general of the state had been filed to forfeit the franchise of said company because the same was against public policy and the constitution of the state, what would have been the answer? 1. That the act is not prohibited by the constitution; 2. That the legislature is the sole judge, under our laws, of the necessities of the state and of its policy. And as they have chartered this and other such corporations to provide revenues, etc., and as the direct tendency of the same is not to destroy law and order, it must be sustained, although the propriety of the act may be doubted. "Courts have no right to sit in judgment upon the wisdom of the legislature, or to pass upon the expediency of a law; these are questions exclusively for the legislature." Leonard v. Wiseman, 31 Md. 204. A contract, valid at the time when made, cannot be impaired by subsequent legislation. Gelpeke v. City of Dubuque, 1 Wall. 175; Havemyer v. Iowa City, 3 ib. 294, 327; Chicago v. Sheldon, 9 Wall. 50; White v. Hart, 13 ib. 646; Cooley on Const. Lim. 279–295. And here it may be necessary to say that a constitution is a "law," within the meaning of that clause of the constitution of the United States which provides that "no state shall pass any law impairing the obligation of contracts." Railroad Company v. McClure, 10 Wall. 511.

We admit that, where a mere license to raise money by lottery or otherwise is given to a corporation, and no capital or property is required in the organization of such company, it partakes of the nature of a penalty or tax, and can be repealed by the legislature.

In the case at bar, the charter required a subscription of of $100,000 to the stock of said company, and that $25,000 of said sum should be paid before it should

commence business, and the charter embraces every
element necessary to make it a private corporation, in
which the owners have a vested beneficial interest.  See
Dartmouth College v. Woodward, 4 Wheat. 485, 492,
493.  Can the legislature, after the state has received
such a large consideration for the charter, and after
such important rights of property have been acquired
in said corporation, by declaring that such corporation
is now against the public policy of the state, repeal the
charter, and destroy $100,000 worth of property which
has been invested in said corporation on the faith of its
charter.  Is that not "impairing the obligation of
contracts?"  States cannot thus change their laws with
every change of popular sentiment.   Terrut v. Taylor,
9 Cranch, 43 ; Dowsen v. Godfrey, 4 ib. 323 ; Dart-
mouth College, 4 Wheat. 518, 706, 707 ; Socies, etc. v.
New Haven, 8 Wheat. 481, all establish the doctrine
that no change of government or laws invalidate cor-
porate charters, and that even the dismemberment of
a nation does not have that effect, and that charters
granted anterior to the revolution were sustained after
the declaration of independence.

Can the legislature by a mere act of repeal forfeit
the franchises of a corporation, and make its officers
liable, criminally, for the exercise of their corporate
powers?  A franchise is property of which no man can
be be deprived, "except by due process of law," and it
is inconsistent with the spirit and letter of our consti-
tution that any department of government can both
make and execute the laws; and if the legislature has
the doubtful power of repealing a charter, its functions
cease with the act of repeal, and no forfeiture under
such repeal ever takes place until judicially ascertained
and declared by proceedings in some court, by *scire
facias* or *quo warranto,* as the case may require ; and
our Code, section 1590, provides the means of ascer-
taining and declaring a forfeiture, and disposing in such

case of the corporate property, and all the authorities agree that the mode of enforcing a repeal is by proper proceeding in court. See Angell & Ames on Corporations, new edition, §§ 767, 778; old edition, p. 665; Regents, etc. v. Williams, 9 Gill & Johns. 412. All acts of corporations are valid until judicially declared otherwise, and cannot be collaterally attacked. 21 Eng. Law and Eq. Rep. 371; Buncomb Turnpike Co. v. McCorson, 1 Dev. & Bat. 306; Bohannan v. Binns, 31 Miss. 355, and the very numerous authorities cited on pp. 394, 340, Abbott on Corporations.

*J. S. Morris*, attorney-general.

The main features in this case were so fully discussed by this court in the case of the Mississippi Society of Arts and Sciences v. Henry Musgrove, Auditor, 44 Miss. 819, that no very extended argument on the part of the state is now deemed necessary. The chief difference between that case and the present is, that in the first the owners of the charter did not pretend to have performed, but only to have tendered a performance of all the conditions of their charter, before its privileges were prohibited by the adoption of the new constitution. In this case it is claimed, and the demurrer admits the fact, that all the conditions, including the payment of a bonus to the state, had been fully complied with.

The naked question is, therefore, here presented, whether it was in the power of the legislature of 1867 to so sell out for a consideration the police power of the state, or to so bind the hands of the government as to disable it for twenty-five years from prohibiting what may be considered an immoral and corrupting pursuit? It is too late now for the question of the vicious and corrupting tendency of lotteries or other gaming to be considered as any longer open for discussion. They are denounced as criminal, and therefore prohibited by

the laws of nearly or quite all the states, and especially by the legislation of this state for the last fifty years. See Poindexter's Code of 1822, p. 326 ; Hutch. Code of 1848, p. 945 ; Code of 1857, p. 597. And the conviction that the practice is immoral having thus forced itself upon the minds of the legislative authority of so many states, and expressed itself in this state from its infancy, and in all its successive codes of laws, had, in 1869, become so strong in the minds of the people of Mississippi that they then embodied it in a deliberate constitutional prohibition. Art. 12, § 15. Indeed, no stronger proof of the immorality of the enterprise intended by the several acts of that legislature, of which this is one, than is found in the disguises under which they were authorized. This one is called the " Mississippi Agricultural, Educational and Manufacturing Aid Society ; " another was called the " Mississippi Society of Arts and Sciences ; " another was " The Benevolent Aid Association for the Benefit of the Lunatic Asylum and Orphans' Home," and another was " for the benefit of the Orphans' Asylum at Natchez." Such are the imposing titles given to all these charters ; and yet, if you look beyond the titles, into the bodies of the bills themselves, you will find that each of them covers a chartered villainy. Each of them should have been entitled " An act further to debauch the public sentiment of this age, and teach the rising generation to become gamblers."

Whether it be true or not that in this case all the conditions of the charter were fully performed, the demurrer, upon the sustaining of which in the court below the case comes here, admits the pleas, and I accept it as a basis of fact for determining the validity of this charter as against the subsequent constitutional and statutory prohibitions.

Was the clause in the constitution of the United States, which forbids the states to impair the obliga-

tion of contracts, intended to shelter immoral practices ?
Is there no limit to that prohibition in favor of the
police power of the states for the preservation of the
public order and the proprieties of civilized life ?  Sup-
pose, that instead of chartering a company for carrying
on the lottery business for twenty-five years, for $5,000,
the legislature had chartered a company to establish a
school for prostitution, to be kept up for fifty years, for
·the sum of $10; would counsel contend that such a
charter would be protected by the constitutional pro-
vision which protects contracts ?  Certainly not.  Why
not ?   Because he would say that there was a limit to.,
the kind of charters that should be considered as such
contracts so protected—a limitation in favor of good
morals.   Exactly.   But where is that limit ?   Chief
Justice Marshall, stated in the Dartmouth College case,
when he said : " The framers of the constitution did not
intend to restrain the states in the regulation of their
civil institutions adapted for internal government, and
the instrument they have given us is not to be so con-
strued."   4 Wheat. 518, 629 ; Story on the Const.
(3d ed.) § 1392.   Here then is the limit which separates
cases of this kind from all others, and the observance
of which upholds the federal constitution, protects the
obligation of legitimate charters and contracts, leaves
the police power of the state active, strong and free,
and preserves the public decency from the dangers that
might arise from hasty, deceitful, mistaken and cor-
rupt legislation.

In his very valuable work on Constitutional Limita-
tions, Judge Cooley says : " This subject has often
been considered in its bearings upon the clause of the
constitution of the United States, which forbids the
states passing any laws violating the obligation of con-
tracts, and invariably it has been held that this
clause does not so far remove from state control the
rights and properties which depend for their existence

or enforcement upon contracts as to relieve them from the operations of such general regulations for the good government of the state, and the protection of the rights of individuals as may be deemed important. All contracts and all rights, it is held, are subject to this power; and regulations which affect them may not only be established by the state, but must also be subject to change from time to time with reference to the general well-being of the community, as circumstances change, or as experience demonstrates the necessity." *Vide* 2d ed., pp. 574–5.

In the case of the Metropolitan Board of Excise v. Barrie (34 N. Y. Court of Appeals Reports, 663), the defendants were indicted for retailing liquors without a license, their license, for which they had, under the statute, paid from $30 to $250, having been revoked by subsequent enactment. In disposing of the subject of the " vested rights " of the defendants, the court say (p. 667): " It (the recent act), in terms, it is true, revokes licenses granted under the act of 1857, but that is no encroachment upon any right secured to the citizen as inviolable by the fundamental law. These licenses to sell liquors are not contracts between the state and the persons licensed, giving the latter vested rights, protected on general principles and by the constitution of the United States against subsequent legislation; nor are they property in any legal or constitutional sense. They have neither the properties of a contract or of property, but are merely permits to do what otherwise would be an offense against a general law. They form a portion of the internal police system of the state; are issued in the exercise of its police powers, and are subject to the direction of the state government, which may modify, revoke, or continue them, as it may deem fit. If the act of 1857 had declared that licenses under it should be irrevocable (which it does not, but, by its very terms, they are

revocable), the legislatures of subsequent years would not have been bound by the declaration.   The necessary powers given by the constitution cannot be sold, given away or relinquished.   Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of a state; but no one legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police."   Citing Alger v. Weston, 14 Johns. 231; People v. Morris, 13 Wend. 329; State v. Holmes, 38 N. H. 225; Calder v. Kirby, 5 Gray, 597; Hun v. State, 1 Ohio, 15; Wynehamer v. the People, 3 Kern. 378; License, 5 How. (U. S.) 504; Butler v. Pennsylvania, 10 How. 416; Coates v. the Mayor, 7 Cow. 585; 2 Pars. on Cont. 538; 3 ib. (5th ed.) 556.

I have examined also the following cases, referred to by Cooley, and find that they fully sustain the view I have taken: Thorpe v. R. & B. Railroad Co. 27 Vt. 149; Freleigh v. State, 8 Mo. 614; State v. Stirling, ib. 697; State v. Hawthorn, 9 ib. 393; O. & M. Railroad Co. v. McClelland, 25 Ill. 144.

PEYTON, C. J.:

At the September term, 1872, of the circuit court of Yalobusha county, Henry H. Moore was indicted for selling, on the 16th day of September, 1872, a lottery ticket, to be drawn in a lottery and gift enterprise within this state.

To this indictment the defendant pleaded, that in issuing the ticket mentioned and specified in the indictment, he was acting as the agent of the Mississippi Agricultural, Educational and Manufacturing Aid Society, a body politic and corporate, which was duly incorporated by an act of the legislature of the state of Mississippi, approved February 16th, 1867, and that prior to the adoption of the present constitution of said

state, the said Mississippi Agricultural, Educational and Manufacturing Aid Society fully complied with all the provisions of said act of incorporation.

To this plea the district attorney demurred, on the ground that it shows no valid bar to the prosecution. The demurrer was sustained by the court, and leave granted to the defendant to plead over; and upon the plea of not guilty, the case was submitted to a jury, who found the defendant guilty as charged in the indictment; whereupon the court sentenced the defendant to pay a fine of $250, and to be imprisoned in the county jail of said county for the space of seven days, and that he pay the costs of prosecution, and stand committed till the fine and costs are paid.

From this judgment, the defendant prosecutes this writ of error, and assigns for error the action of the court in sustaining the demurrer to the defendant's special plea in bar.

The 15th section of the 12th article of the present constitution of this state provides that the legislature shall never authorize a lottery, nor shall the sale of lottery tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold; and the act of the legislature, approved July 9th, 1870, makes it the imperative duty of the attorney-general to enforce this provision of the constitution.

It is insisted on the part of the plaintiff in error, that the act of incorporation, under the authority of which he acted in the sale of the lottery ticket, was a contract between the corporators and the state, which was protected by that clause of the 10th section of the 1st article of the constitution of the United States, which prohibits a state from passing any law impairing the obligation of contracts.

On the part of the state, it is contended that the said act of incorporation conferred a privilege upon the

corporators to draw lotteries and to deal in lottery tickets, which was not shielded by the above mentioned clause in the constitution of the United States against the future legislation of the state, and that said act was abrogated by the 15th section of the 12th article of our present constitution, which prohibits any lottery heretofore authorized to be drawn, or tickets therein to be sold; and the act of 1870, above mentioned, prescribes the penalty for violating this provision of our constitution.

It will thus be seen, that the grave and important question presented by this case for our solution, is: Is the act of 1867, relied upon by the plaintiff, so protected by the above stated clause in the constitution of the United States, as to remain unaffected by the said 15th section of the 12th article of the existing constitution of this state?

There can be no doubt that a private corporation to whom a franchise has been given for a legitimate purpose, such as banks, insurance, manufacturing and railroad companies, is a contract which would be protected by the clause above referred to, of the Federal constitution, from legislative interference, unless the legislature reserved to themselves, in the charter of such corporation, the right to repeal, modify or change it.

After an exhaustive research into the authorities upon this subject, we have been unable to find a case where a charter has been granted to deal in lotteries for a series of years that has been dignified with the name of contract, and protected by the Federal constitution from the future legislation of the state.

Lotteries have sometimes been allowed as a speedy means of raising money for some laudable purpose, such as to build a church or a school-house; they may thus be used as a collateral means to effect good and charitable ends; but never to be carried on solely for the

pecuniary profits arising from the business, in utter disregard of the public weal.

Morality, religion and education are the three main pillars of the state, and the substance of all private good. They should, therefore, be objects of primary regard by the laws; and any legislation that would have a tendency to banish either of these from the community ought not to be favored.

Suppose the legislature of 1867, instead of the privilege of selling lottery tickets throughout the state, and of drawing lotteries in the city of Vicksburg, had granted to said corporation, for a bonus of $5,000, the privilege of keeping a common gaming-house in the city of Jackson, in this state, for the period of twenty-five years; can it, with any shadow of reason, be contended that the bonus can give to such pernicious privilege the sanctity of a contract which would be shielded by the constitution of the United States against any subsequent legislation of the state? And yet there is very little difference in their demoralizing tendencies. The privilege to do wrong cannot, it is believed, be thus purchased and fastened, like the shirt of Nessus, upon the community, without any power of getting rid of it for a quarter of a century. Such a doctrine would deprive the state of the power to right herself by repealing any reckless legislation whose certain tendency is to corrupt the fountain of public morals.

Justice Grier, in delivering the opinion of the supreme court of the United States, in the case of Phalen v. Virginia (8 How. 168), says: "The suppression of nuisances injurious to public health or morality is among the most important duties of government. Experience has shown that the common forms of gambling are comparatively innocuous when in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling, it reaches every

class, it preys upon the hard earnings of the poor, and plunders the ignorant and the simple."

If this be a correct view of the effects of lotteries, they can hardly lay claim to the protection of the federal constitution against legislative interference on the part of the state in the matter of such vital importance to the welfare of the state.

No extraordinary latitude should be given to the use of this provision in the constitution of the United States. No general power is given to the federal government over the affairs of the states. Chief Justice Marshall has said: " The framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given to us is not to be so construed." Dartmouth College v. Woodward, 4 Wheat. 518, 529.

The owner of a lot in a city intends to build a wood house; the constituted authorities say you must not exercise that right; it is dangerous to all; you may build of brick or stone, because the safety of all is in this way promoted. Can the owner with impunity violate such a law, because he has the absolute right of property ?

The policy of the state has always been opposed to lotteries which, from 1822 to 1867, have been prohibited by law and punished as a species of gaming; and it is believed to be one of the highest duties of the legislature to watch over the morals as well as the health and education of the people, and that, whenever the preservation and inculcation of sound morals may require it, we think the legislature has the power to abolish a lottery license or privilege, as a part of the police power of the state to regulate her own domestic concerns, and the exercise of that power does not violate that provision of the constitution of the United States, which prohibits a state from passing any law

impairing the obligation of contracts. Phelan's Case, 1 Rob. (Va.) 725, and Hern v. the State of Ohio, 1 Ohio St. 16. The question of lottery is regarded by a distinguished author as one of mere police. Wharton on Conflict of Laws, § 490.

Gaming itself, not being a common law offense, the mere single act of gaming in one's house would be no offense at common law; but the keeping of a common gaming house would be indictable at the common law, for the reason that persons, especially young persons, are attracted there, and lured to vice; neither is the single act of drawing a lottery for some lawful purpose objectionable, but the evil results from its repetition and continuance as a regular business for a series of years.

Notwithstanding the imposing title of the act of incorporation in the case under consideration, it is not difficult to perceive that the main object of the act was to secure the privilege of doing a lottery business for the period of a quarter of a century, regardless of its demoralizing effects upon the community, and in violation of the long cherished public policy of the state.

It is insisted by counsel for the plaintiff in error, that the validity of the charter cannot be tested in this collateral way. It must be done by a direct proceeding against the corporation by *quo warranto*, or an information in the nature of a *quo warranto*. This would be true, if it were a proceeding for a forfeiture of the charter; but this is not the case. The only question is, was the charter abrogated by the present constitution of the state?

Mr. Parsons, in his valuable work on Contracts, puts the question: " Can a legislature, having authorized an individual or a company to raise a certain sum of money by lotteries, or after having licensed individuals to sell spirituous liquors for a certain period, afterward, for the purpose of preserving the public

morals, recall such authority or license by a general law prohibiting lotteries or the sale of spirituous liquors? And if this can be done where the grant or license was gratuitous, can it also be done if a certain price or premium was paid for it?" He then proceeds to say: "While the authorities are not uniform, we consider the prevailing adjudication in this country to favor the rule, that such general laws are not, in either case, within the purview of prohibition of the constitution." 3 Pars. on Contracts, 556.

Concurring with Mr. Parsons in this view of the law, we affirm the judgment of the court below.

Simrall, J.:

It was sufficient for the disposition of the case of Mississippi Society of Arts and Sciences v. Musgrove, Auditor (44 Miss. 833), that the "society" and corporation had not complied with the conditions precedent, upon performance of which, under the charter, the lottery franchise inured to the corporation before the prohibitory clause of the constitution took effect. In the course of the opinion there was some discussion as to the character of contracts contemplated in the federal constitution, the obligations of which the states are prohibited from impairing. In the leading early case of Dartmouth College v. Woodward, 4 Wheat., arising under this prohibition, the chief justice declared that the framers of the constitution did not intend by this "clause" "to restrain the states in the regulation of their civil institutions adopted for internal government." As to supervision and control over internal police, the legislative power of the state is unaffected by this provision of the constitution. In the Dartmouth College case, the endowment of the institution had been made by private individuals who founded the charity. Its object was to impart knowledge by means of instruction; to promote the happiness and improve-

ment of the community by those means universally conceded to be proper and necessary, and the encouragement of which. are expressly enjoined upon the legislature by the constitution of this and every other state.   Whilst the states may not repeal or materially alter charters to promote charities and eleemosynary institutions established by private means and enterprise, it is (such is the deduction from the reasoning of the court) unrestrained over those subjects which immediately affect internal police, sanitary and moral. " Governments are instituted among men for their happiness."   Among the most efficient modes to accomplish this purpose are prohibition of these practices which impair the industries and weaken and corrupt morals or endanger the public health.   On this point it was said, in the lottery case reported in 44 Miss. 836 : " Individuals must be considered as making their contracts and covenants subject to the contingent right in the state (within the just application of the principle) of partial impairment or total abrogation of their contracts."   If the legislature should to-day charter a company to slaughter animals for the Vicksburg market, on a certain lot of ground now in the suburbs of that city, or to conduct a tallow chandlery, and ten years hence the city should grow and spread around it; if lands are donated by the state or a private individual, to be forever used as a cemetery and for no other purpose, if the increased population settled about it require that no more interments be made because of the detriment to health, can, in either of these cases, the inviolability of the obligation of the contract be appealed to as estopping the exercise of the police power?

In these instances, and others that might be stated, the contract, as contained in the charter or grant, is made to yield to the paramount public good.   They are excepted out of the constitutional prohibition; they do not come within its intendment and reason.   They

are not included, because the state cannot abnegate or surrender the duty, which is perpetually upon it, to consult the physical and moral good of the people.

It is not controverted that lotteries are a species of the games of hazard, more enticing, more generally indulged in than any other form, and that they are detrimental to industry, sobriety and good morals. If they are nuisances, although conducted under a license from the state which has been paid for, is a subsequent legislature or convention impotent to abate them? As supposed by the chief justice, if the legislature of 1867 had granted, in consideration of a sum of money, the exclusive right to a company to set up and conduct, in the city of Jackson, for the term of twenty-five years, all species of games and gambling, must the corporation of Jackson submit to the demoralizing influence? and are subsequent legislatures restrained by the prohibition of the federal constitution from abolishing it?

Whilst the states are independent on all subjects of purely local and domestic policy, yet, as they and the people are united in one common government, it was eminently wise and expedient that the medium which fixed the standard of values, and also the close and intimate commerce which would naturally spring up among them, should be regulated by a rule common to all. Therefore, the framers of the federal constitution, in order to promote harmony and uniformity, imposed certain restrictions upon the states. These restrictions in the 10th section of the 1st article, when carefully considered, were meant to confine the states to harmonious relations with each other in the federal union, and to prevent the adoption of laws and regulations which might disturb a uniformity which should be common to all. Among these are: The state shall not pass laws "impairing the obligation of contracts," or "make anything but gold and silver coin a tender in payment of debts." The obligation of contracts should

be inviolable in all the states. The medium, or currency, in which they may be discharged, should be of the same value in all of them. The convention put it out of the power of the state legislatures to declare what should be a tender for a debt due here, to a citizen of New York, except the coin of the precious metals, as established by congress. So, also, the state cannot, under the pressure of pecuniary embarrasment and distress, intervene by relief laws or otherwise, to the impairment of the obligation of contracts between individuals, or which itself has come under. It would be impossible that the business and commerce, now so extensive and ramified among the people of these states, and destined to a still larger expansion, could be conducted safely and prosperously, except on the basis of a uniform currency, as a standard of values, and the inviolability of contracts. This was the primary consideration that induced the framers of the constitution to impose these two restrictions upon the states. It was not designed to limit the authority of the state in dealing with subjects promotive of health, happiness and morals within its limits. The state cannot abnegate its jurisdiction over these internal and domestic interests. It may grant charters to eleemosynary societies to provide for the sick and the indigent, to dispense education, and promote the spread of knowledge and religion. It may charter railroads, turnpikes, and manufacturing and other associations; to help the citizens, by united effort and capital, to build up industrial enterprises, and may incur with such incorporators the obligation of a contract.

The state is under the same duty of self-preservation as the individual; it can no more renounce its obligation to consult its safety, by promoting the virtue and morals of the whole community, than the individual can lay aside his natural and moral duties. If a law be passed, which promotes idleness and vice, the state

cannot surrender its power to cure the evil because it has accepted a consideration for the license it has granted to offend the public conscience and injure its morals. The legislature is not prohibited from exerting its police power by repealing a law which is deleterious and injurious in its moral effects, although those who derive the benefit under the law have paid a consideration for the license.

Where the law is palpably and manifestly of that character, the prohibition of the constitution does not apply.

It may be that the state, in some circumstances, on repealing the law, ought to restore the bonus, but that is a subject with which a court has no concern.

So the use of property in a particular way may be, at one time, lawful and unobjectionable, but may, subsequently, become deleterious to public health and safety—as where a mill-dam, by submerging a considerable area of land, causes noxious malaria to spread. A subsequent development of this injurious effect brings up the question, whether the owner shall continue this use of the property, or whether it shall be abated as a nuisance. The authorities are abundant that the private right must yield to the public good. Brady v. N. W. In. Co., 11 Mich. 425; Respublica v. Duquet, 2 Yates, 493.

It were utterly indefensible in reason that the legislature should have these large and necessary powers over subjects connected with material interests, and yet it should fail for want of power to control in matters that affect the public morals. It is said by an eminent jurist (Cooley Const. Lim. 596): "That the preservation of public morals is peculiarly subject to legislative supervision." The " freedom of speech and of the press shall not be abridged." Federal Const., art. 1 of amendment. "The freedom of speech and of the press shall be held sacred." Sec. 4, Bill of Rights

(state constitution). Yet the legislature may forbid the keeping, publishing, or sale of indecent books, and upon seizure cause their destruction; it may prohibit and break up resorts for gaming; it may provide compulsorily for the observance of Sunday. Nolin v. Mayor of Franklin, 4 Yerg. 163; Tanner v. Trustees of Albion, 5 Hill, 121; Commonwealth v. Cotton, 8 Gray, 488.

It was affirmed, in Thorpe v. Rutland & Burlington R. R. Co., 27 Vt. 140, that the general control over the public of the country "resides in the law-making department of all free states, which cannot be violated so as to deprive the legislature of the power, even by express grant to any mere public or private corporations." "This is a responsibility which legislatures can not divest themselves of if they would."

In the license cases, 5 How. (U. S.) 577, the laws of Massachusetts, New Hampshire and Rhode Island, respecting the traffic in ardent spirits, were considered in reference to their supposed conflict with that clause of the constitution which grants to congress power to regulate foreign commerce and commerce between the states. Chief Justice Taney said, if any state deems the retail and internal traffic in ardent spirits injurious, and calculated to produce idleness, vice and misery, there is nothing in the constitution of the United States to prevent it from regulating, or restraining, or prohibiting, the traffic altogether, if it thinks proper to do so. In Brown v. Maryland, 12 Wheat., it had been declared that the state could not, by taxation in the form of license or otherwise, touch the import in the original package; but that, so soon as, in that form, it left the importer's hands and mingled with the mass of property, it at once became subject to state legislation. The effect of the principle declared by the chief justice was, that although the state could not interrupt the importation of foreign

liquors and a sale by the importer, yet, when the liquor passed from him, the state could prohibit its sale altogether or declare that it should not be sold in less quantities than thirty-eight gallons, which was one of the statutes under review, and that such laws were not in conflict with the commercial power conferred upon congress. After the import has passed from the importer, whether it remain in the original package or cask, or has been broken up, it is subject to the laws of the state. The argument made against these laws was, that they seriously and injuriously trenched upon the power of congress. But the judges' in *seriatim* opinions concurred that the commercial power did not interfere with the fullest exercise of the police authority by the state. Passengers infected with contagious disease might be refused a landing; goods so infected might be destroyed. The right of the state to provide for the safety, welfare and happiness of its people cannot be assigned a precise limit; the changing exigencies of society require new regulations. In the progress of population, wealth and civilization, new and vicious indulgences spring up or obtain a wider influence, which demand the restraint of remedial and punitive law. The authority of the state ought to be co-extensive with the evil. The state may suppress those things which are injurious to either body or mind; it may exclude passengers coming from a district infested with plague or cholera; it may forbid the sale and circulation of obscene pictures and books; it may shut out convicts and paupers. 11 Pet. 568; 9 Wheat. 203; 11 Pet. 133; Prigg v. Pennsylvania, 16 ib. 625.

Mr. Justice Grier, in 5 How. 631, said: "The powers which relate to merely municipal regulations, or more properly internal police, are not surrendered by the states, or restrained by the constitution of the United States, and, in relation to these, the authority of the state is complete, unqualified and conclusive. The

exigencies of the social compact require such laws to be before and above all others." Quarantine laws, although for a time suspending commerce and intercourse with certain ports or countries, are necessary to the public safety. They may restrain the liberty of passengers, they may justify the detention of the ship at sea, they may permit the destruction of the imports themselves. These things, and such as these, may be done, in order that police laws for the preservation of health, prevention of crime and pauperism, and promotion of the common weal, may have full and free operation.

In Baker v. Boston, 12 Pick. 193, the question was as to the power of the city to fill up a creek on the lands of the citizen, on the ground that it was deleterious to health. The measure was a mere health law, and every citizen held his property subject to such regulations. "Nor was the owner entitled to compensation." Such was the ruling. In Stuyvesant v. Mayor of New York, 7 Cow., the doctrine is advanced, that it makes no difference as to the form of the grant; if property is dedicated by the terms of the conveyance to a particular use, as a cemetery for interment of the dead, or for the storage of gunpowder or explosive oils, and it afterward becomes a nuisance, the police power is not restrained or prohibited from removing the nuisance. In this class of cases there is not a forfeiture of the property itself; but the public destroys the use to which the property was granted. It intervenes and breaks up the scheme established in the contract between grantor and grantee. In People v. Hawley, 3 Mich. 342, the defendant had invested large sums in erecting buildings and fixtures for brewing ale and beer, before the prohibitory law took effect. He opposed the law as depriving him of property (which for any other purpose was comparatively useless) "without compensation first made." But it was ruled

that this was not taking private property for a public use, but that the prohibitory law was a police regulation " which might be extended to the prohibition of any trade or employment which is found hazardous or injurious to citizens, and destructive of the best interests of society."

The legislative authority rests upon the right, in all these instances, to take care of the health, happiness, morals and welfare of the community. It is a paramount duty to preserve the public safety. Therefore, the tenure by which private property is held, and the use to which it is devoted, is subordinate to the police authority, and is not affected and embraced by those provisions of the constitution which confer on congress the regulation of foreign and inter-state commerce, and the inhibition of laws impairing the obligation of contracts. Whilst the state cannot prevent the importation of liquors and licentious and obscene pictures and books, it may break up the internal traffic in liquors altogether, and may seize and condemn obscene prints and books to be destroyed. Such laws, if adopted by all the states, would have the effect to cut off the importation of liquors, almost altogether, and would most seriously impede the foreign traffic therein, and diminish the income from the tariff; yet, in the license cases, they were sustained as valid police regulations. So, too, when private property, although granted for a use harmless and innocent at the time, if experience shall show that the use is prejudicial to the public, such use may be prohibited.

If the principle be sound, as intimated in some of the cases, and distinctly announced in others, that the legislature cannot abnegate to a grantee, in any form, its authority to make needful and proper regulations of police, to promote and conserve good order, health and morals, then the prohibition of the federal constitution cannot be invoked in this case on the ground assumed.

The 9th section of the bill of rights is a literal copy of two clauses from the federal constitution, to wit: "No *ex post facto* law, or law impairing the obligation of contracts, shall ever be passed." The 15th section of the 12th article is in these words: "The legislature shall never authorize any lottery, nor shall the sale of lottery tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein permitted to be sold." The convention refers to the fact that lotteries "had been authorized," and then declares " that such lotteries shall not be permitted to be drawn." The purpose cannot be imputed to the framers of the constitution, of deliberately inserting a section which would conflict with the federal constitution, and with a previous section of the same constitution. The convention could not have thought that this lottery grant of 1867 was a " contract" within the meaning of the federal constitution and the bill of rights above quoted, otherwise it is put in the category of deliberately infringing upon the " inviolability of contracts," which the state, whether making organic law in convention or by ordinary legislation, cannot do. We must assume that it was the sense of the convention, and subsequently of the legislature, that the license granted to these corporations was not embraced in the prohibition of the federal constitution and the bill of rights. In other words, the legislature cannot, in the form of franchises and licenses, allow that to be done for a long term of years, which experience demonstrates to be injurious to morals, and a snare to entice money from the ignorant and the unwary; and when the evil is attempted to be abolished, the legislative corrective be arrested on the plea of the inviolability of contracts.

The very strong tendency of the courts in late years has been to except out of the constitutional prohibition that class of laws, purely of police.

The line which separates the constitutional from the unconstitutional exercise of power on this and many other subjects is dim and shadowy. It is not possible to lay down a general rule of universal application. There is a region where certainty ends and doubt begins. There is no safer rule to guide the judicial mind, in all cases of well-founded doubt as to the constitutionality of a law, than to refer to the law-making department. To pronounce a law invalid, the judiciary must distinctly perceive and point out its conflict with the organic law.

It is eminently expedient and wise to uphold the inviolability of contracts. It is also essential to the safety of the public that the law-making department should have full authority to regulate and abate all evil practices and vices that are hurtful to society. If the legislature may grant a lottery franchise for one generation, it may do so for two or more, or for an indefinite term of years. If it should turn out, in after experience, that its effects in the community were to encourage idleness and recklessnes, to beget the disposition to live by the chances of gaming rather than the pursuits of industry to encourage, in the young and inexperienced, vicious instead of virtuous habits, it would be a matter of regret to all who cherished the public good that there was no remedy for the improvident and inconsiderate act of the legislature that authorized it. If the views which have been advanced (in much doubt, it is confessed, whether not carried too far) are correct, the charter pleaded is not a contract embraced in the reason and intendment of the constitutional inhibition, and it was competent to make the prohibitory laws.

Although entertaining some doubt as to the correctness of the conclusion reached, I have, in accordance with a settled rule, deferred to the convention and the legislature.