# BUTCHERS' UNION SLAUGHTER-HOUSE AND LIVE-STOCK LANDING COMPANY *v.* CRESCENT CITY LIVE-STOCK LANDING AND SLAUGHTER-HOUSE COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued April 9th, 10th, 1884.—Decided May 5th, 1884.

### Constitutional Law.

The power of a State Legislature to make a contract of such a character that, under the provisions of the Constitution, it cannot be modified or abrogated, does not extend to subjects affecting public health or public morals, so as to limit the future exercise of legislative power on those subjects to the prejudice of the general welfare.

In 1879 the legislature of Louisiana granted the appellee exclusive privileges for stock-landing and slaughter-houses, at New Orleans for twenty-five years, which were sustained by this court in the *Slaughter-House Cases,* 16 Wall. 36. In 1881, under a provision of the State Constitution of 1874, the municipal authorities granted privileges for slaughter-houses and stock-landing at New Orleans to the appellants. The appellee as plaintiff below filed its bill in the Circuit Court to restrain the appellants from exercising the privileges thus conferred. A preliminary injunction was granted, which, on hearing, was made perpetual. From this decree the defendants below appealed. The legislation and other facts bearing upon the issues are stated in the opinion of the court.

*Mr. B. R. Forman* for appellant.

*Mr. Thomas J. Semmes* for appellee.

Mr. Justice Miller delivered the opinion of the court.

This is an appeal from the Circuit Court for the Eastern District of Louisiana.

The appellee brought a suit in the Circuit Court to obtain an injunction against the appellant forbidding the latter from ex-

ercising the business of butchering, or receiving and landing live-stock intended for butchering, within certain limits in the parishes of Orleans, Jefferson, and St. Bernard, and obtained such injunction by a final decree in that court.

The ground on which this suit was brought and sustained is that the plaintiffs had the exclusive right to have all such stock landed at their stock-landing place, and butchered at their slaughter-house, by virtue of an act of the General Assembly of Louisiana, approved March 8th, 1869, entitled " An act to protect the health of the city of New Orleans, to locate the stock-landing and slaughter-houses, and to incorporate the Crescent City Live-Stock Landing and Slaughter-House Company."

An examination of that statute, especially of its fourth and fifth sections, leaves no doubt that it did grant such an exclusive right.

The fact that it did so, and that this was conceded, was the basis of the contest in this court in the *Slaughter-House Cases,* 16 Wall. 36, in which the law was assailed as a monopoly forbidden by the thirteenth and fourteenth amendments to the Constitution of the United States, and these amendments as well as the fifteenth, came for the first time before this court for construction. The constitutional power of the State to enact the statute was upheld by this court.

This power was placed by the court in that case expressly on the ground that it was the exercise of the police power which had remained with the States in the formation of the original Constitution of the United States, and had not been taken away by the amendments adopted since.

Citing the definition of this power from Chancellor Kent, it declares that the statute in question came within it. " Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and the burial of the dead, may all (he says) be interdicted by law in the midst of dense masses of population, on the general and rational principle that every person ought so to use his property as not to injure his neighbors ; and that private interests must be made subservient to the general interest of the community."

2 Kent's Commentaries, 340; 16 Wall. 62. In this latter case it was added that "the regulation of the place and manner of conducting the slaughtering of animals, and the business of butchering within a city, and the inspection of the animals to be killed for meat, and of the meat afterwards, are among the most necessary and frequent exercises of this power."

But in the year 1879 the State of Louisiana adopted a new constitution, in which were the following articles:

" Article 248. The police juries of the several parishes, and the constituted authorities of all incorporated municipalities of the State, shall alone have the power of regulating the slaughtering of cattle and other live-stock within their respective limits ; provided no monopoly or exclusive privilege shall exist in this State, nor such business be restricted to the land or houses of any individual or corporation ; provided the ordinances designating places for slaughtering shall obtain the concurrent approval of the board of health or other sanitary organization.

" Article 258. . . . The monopoly features in the charter of any corporation now existing in the State, save such as may be contained in the charters of railroad companies, are hereby abolished."

Under the authority of these articles of the Constitution the municipal authorities of the city of New Orleans enacted ordinances which opened to general competition the right to build slaughter-houses, establish stock landings, and engage in the business of butchering in that city under regulations established by those ordinances, but which were in utter disregard of the monopoly granted to the Crescent City Company, and which in effect repealed the exclusive grant made to that company by the act of 1869.

The appellant here, the Butchers' Union Slaughter-House Company, availing themselves of this repeal, entered upon the business, or were about to do so, by establishing their slaughter-house and stock-landing within the limits of the grant of the act of 1869 to the Crescent City Company.

Both these corporations, organized under the laws of Louisiana and doing business in that State, were citizens of the same

State, and could not, in respect of that citizenship, sue each other in a court of the United States.

The Crescent City Company, however, on the allegation that these constitutional provisions of 1879 and the subsequent ordinances of the city, were a violation of their contract with the State under the act of 1869, brought this suit in the Circuit Court as arising under the Constitution of the United States, art. I., sec. 10. That court sustained the view of the plaintiff below, and held that the act of 1869 and the acceptance of it by the Crescent City Company, constituted a contract for the exclusive right mentioned in it for twenty-five years ; that it was within the power of the legislature of Louisiana to make that contract, and as the constitutional provisions of 1879 and the subsequent ordinances of the city impaired its obligation, they were to that extent void.

No one can examine the provisions of the act of 1869 with the knowledge that they were accepted by the Crescent City Company, and so far acted on that a very large amount of money was expended in a vast slaughter-house, and an equally extensive stock-yard and landing-place, and hesitate to pronounce that in form they have all the elements of a contract on sufficient consideration.

It admits of as little doubt that the ordinance of the city of New Orleans, under the new Constitution, impaired the supposed obligation imposed by those provisions on the State, by taking away the exclusive right of the company granted to it for twenty-five years, which was to the company the most valuable thing supposed to be secured to it by the statutory contract.

We do not think it necessary to spend time in demonstrating either of these propositions. We do not believe they will be controverted.

The appellant, however, insists that, so far as the act of 1869 partakes of the nature of an irrepealable contract, the legislature exceeded its authority, and it had no power to tie the hands of the legislature in the future from legislating on that subject without being bound by the terms of the statute then enacted. This proposition presents the real point in the case.

Let us see clearly what it is.

It does not deny the power of that legislature to create a corporation, with power to do the business of landing live-stock and providing a place for slaughtering them in the city. It does not deny the power to locate the place where this shall be done exclusively. It does not deny even the power to give an exclusive right, for the time being, to particular persons or to a corporation to provide this stock-landing and to establish this slaughter-house.

But it does deny the power of that legislature to continue this right so that no future legislature nor even the same body can repeal or modify it, or grant similar privileges to others. It concedes that such a law, so long as it remains on the statute book as the latest expression of the legislative will, is a valid law, and must be obeyed, which is all that was decided by this court in the Slaughter-House Cases. But it asserts the right of the legislature to repeal such a statute, or to make a new one inconsistent with it, whenever, in the wisdom of such legislature, it is for the good of the public it should be done.

Nor does this proposition contravene the established principle that the legislature of a State may make contracts on many subjects which will bind it, and will bind succeeding legislatures for the time the contract has to run, so that its provisions can neither be repealed nor its obligation impaired. The examples are numerous where this has been done and the contract upheld.

The denial of this power, in the present instance, rests upon the ground that the power of the legislature intended to be suspended is one so indispensable to the public welfare that it cannot be bargained away by contract. It is that well-known but undefined power called the police power. We have not found a better definition of it for our present purpose than the extract from Kent's Commentaries in the earlier part of this opinion. "The power to regulate unwholesome trades, slaughter-houses, operations offensive to the senses," there mentioned, points unmistakably to the powers exercised by the act of 1869, and the ordinances of the city under the Constitution of 1879. While we are not prepared to say that the legislature can make

valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so · embraced, it cannot, by any contract, limit the exercise of those powers to the prejudice of the general welware. These · are the *public health* and *public morals.* The preservation of these is so necessary to the best interests of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime.

It cannot be permitted that, when the Constitution of a State, the fundamental law of the land, has imposed upon its legislature the duty of guarding, by suitable laws, the health of its citizens, especially in crowded cities, and the protection ·of their person and property by suppressing and preventing crime, that the power which enables it to perform this duty can be sold, bargained away, under any circumstances, as if it were a mere privilege which the legislator could dispose of at his pleasure.

·This principle has been asserted and repeated in this court in the last few years in no ambiguous terms.

The first time it seems to have been distinctly and clearly presented, was in the case of *Boyd* v. *Alabama,* 94 U. S. 645. That was a writ of error to the Supreme Court of Alabama, brought by Boyd, who had been convicted in the courts of that State of carrying on a lottery contrary to law. In his defence, he relied upon a statute which authorized lotteries for a specific purpose, under which he held a license. The repeal of this statute, which made his license of no avail against the general law forbidding lotteries, was asserted by his counsel to be void as impairing the obligation of the contract, of which his license was evidence, and the Supreme Court of Alabama had in a previous case held it to be a contract.

In Boyd's case, however, that court held the law under which his license was issued to be void, because the object of it was not expressed in the title, as required by the Constitution of the State. This court followed that decision, and affirmed the judgment on that ground.

But in the concluding sentences of the opinion by Mr. Jus-

tice Field, the court, to repel the inference that the contract would have been irrepealable, if the statute had conformed to the special requirement of the Constitution, said :

" We are not prepared to admit that it is competent for one legislature, by any contract with an individual, to restrain the power of a subsequent legislature to legislate for the public welfare, and to that end to suppress any and all practices tending to corrupt the public morals," citing *Moore* v. *The State*, 48 Miss. 147, and *Metropolitan Board of Excise* v. *Barrie*, 34 N. Y. 657, 663.

This cautionary declaration received the unanimous concurrence of the court, and a year later the principle became the foundation of the decision in the case of *The Beer Company* v. *Massachusetts*, 97 U. S. 25, 28.

In that case the plaintiff in error, the Boston Beer Company, had been chartered in 1828 with a right to manufacture beer, which this court held to imply the right to sell it. Subsequent statutes of a prohibitory character seemed to interfere with this right, and the case was brought to this court on the ground that they impaired the obligation of the contract of the charter.

But the court, speaking by Mr. Justice Bradley, held that, on this subject, the Legislature of Massachusetts could make no irrepealable contract. "Whatever differences of opinion," said the court, "may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and public morals. The Legislature cannot by any contract divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, *Salus populi suprema lex*, and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself."

In the still more recent case of *Stone* v. *Mississippi*, 101 U. S. 814, the whole subject is reviewed in the opinion deliv-

ered by the Chief Justice. That also was a case of a char-
tered lottery, whose charter was repealed by a constitution of
the State subsequently adopted. It came here for relief, rely-
ing on the clause of the federal Constitution against impairing
the obligation of contracts.

"The question is, therefore, presented (says the opinion),
whether, in view of these facts, the legislature of a State
can, by the charter of a lottery company, defeat the will of a
people authoritatively expressed, in relation to the further con-
tinuance of such business in their midst. We think it cannot.
No legislature can bargain away the public health or the pub-
lic morals. The people themselves cannot do it, much less
their servants. The supervision of both these subjects of
governmental power is continuing in its nature, and they are
to be dealt with as the special exigencies of the moment may
require. Government is organized with a view to their preser-
vation, and cannot divest itself of the power to provide for
them. For this purpose the legislative discretion is allowed,
and the discretion cannot be parted with any more than the
power itself."

But the case of the *Fertilizing Company* v. *Hyde Park*, 97
U. S. 659, is, perhaps, more directly in point as regard the facts
of the case, while asserting the same principle. The Fertiliz-
ing Company was chartered by the Illinois Legislature for the
purpose of converting, by chemical processes, the dead animal
matter of the slaughter-houses of the city of Chicago into a
fertilizing material. Some ordinances of the village of Hyde
Park, through which this dead matter was carried to their
chemical works, were supposed to impair the rights of contract
conferred by the charter. The opinion cites the language of
the court in *Beer Company* v. *Massachusetts*, already copied
here, and numerous other cases of the exercise of the police
power in protecting health and property, and holds that the
charter conferred no irrepealable right for the fifty years of its
duration to continue a practice injurious to the public health.

These cases are all cited and their views adopted in the
opinion of the Supreme Court of Louisiana in a suit between
the same parties in regard to the same matter as the present

case, and which was brought to this court by writ of error and dismissed before a hearing by the present appellee.

The result of these considerations is that the constitution of 1879 and the ordinances of the city of New Orleans, which are complained of, are not void as impairing the obligation of complainant's contract, and that

*The decree of the Circuit Court must be reversed, and the case remanded to that court with directions to dismiss the bill.*

MR. JUSTICE FIELD concurring.

I concur in the doctrine declared in the opinion of the court, that the legislature cannot, by contract with an individual or corporation, restrain, diminish, or surrender its power to enact laws for the preservation of the public health or the protection of the public morals. This is a principle of vital importance, and its habitual observance is essential to the wise and valid execution of the trust committed to the legislature. But there are some provisions in the act of Louisiana upon which the appellees rely that have not been referred to; and which, from the interest excited by the decision rendered when that act was before us in the Slaughter-House Cases, should be mentioned in connection with the views now expressed. 16 Wall. 36.

No one of the judges who then disagreed with the majority of the court denied that the States possessed the fullest power ever claimed by the most earnest advocate of their reserved rights, to prescribe regulations affecting the health, the good order, the morals, the peace, and the safety of society within their respective limits. When such regulations do not conflict with any constitutional inhibition or natural right, their validity cannot be successfully controverted. The general government was not formed to interfere with or control them. No aid was required from any external authority for their enforcement. It was only for matters which concerned all the States and which could not be efficiently or advantageously managed by them separately, that a general and common government was desired. And the recent amendments to the Constitution have not changed nor diminished their previously existing

power to legislate respecting the public health and public morals. But though this power rests with them, it cannot be admitted that, under the pretence of providing for the public health or public morals, they can encroach upon rights which those amendments declare shall not be impaired. The act of Louisiana required that the slaughtering of cattle and the preparation of animal food for market should be done outside of the limits of the city of New Orleans. It was competent to make this requirement, and, furthermore, to direct that the animals, before being slaughtered, should be inspected, in order to determine whether they were in a fit condition to be prepared for food. The dissenting judges in the Slaughter-House Cases found no fault with these provisions, but, on the contrary, approved of them. Had the act been limited to them, there would have been no dissent from the opinion of the majority. But it went a great way beyond them. It created a corporation, and gave to it an exclusive right for twenty-five years to keep, within an area of 1,145 square miles, a place where alone animals intended for slaughter could be landed and sheltered, and where alone they could be slaughtered and their meat prepared for market. It is difficult to understand how in a district embracing a population of a quarter of a million, any conditions of health can require that the preparation of animal food should be intrusted to a single corporation for twenty-five years, or how in a district of such extent, there can be only one place in which animals can, with safety to the public health, be sheltered and slaughtered. In the grant of these exclusive privileges a monopoly of an ordinary employment and business was created.

A monopoly is defined "to be an institution or allowance from the sovereign power of the State, by grant, commission, or otherwise, to any person or corporation, for the sole buying, selling, making, working, or using of anything whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade." All grants of this kind are void at common law, because they destroy the freedom of trade, discourage labor and industry, restrain persons from getting an

honest livelihood, and put it in the power of the grantees to enhance the price of commodities. . They are void because they interfere with the liberty of the individual to pursue a lawful trade or employment.

The oppressive nature of the principle upon which the monopoly here was granted will more clearly appear if it be applied to other vocations than that of keeping cattle and of preparing animal food for market—to the ordinary trades and callings of life—to the making of bread, the raising of vegetables, the manufacture of shoes and hats, and other articles of daily use. The granting of an exclusive right to engage in such vocations would be repudiated in all communities as an invasion of common right. The State undoubtedly may require many kinds of business to be carried on beyond the thickly settled portions of a city, or even entirely without its limits, especially when attendant odors or noises affect the health or disturb the peace of the neighborhood; but the exercise of this necessary power does not warrant granting to a particular class or to a corporation a monopoly of the business thus removed. It may be that, for the health or safety of a city, the manufacture of beer, or soap, or the smelting of ores, or the casting of machinery should be carried on without its limits, yet it would hardly be contended that the power thus to remove the business beyond certain limits would authorize the granting of a monopoly of it to any one or more persons. And if not a monopoly in business of this character, how can a monopoly for like reasons be granted in the business of preparing animal food for market, or of yarding and sheltering cattle intended for slaughter?

As in our intercourse with our fellow-men certain principles of morality are assumed to exist, without which society would be impossible, so certain inherent rights lie at the foundation of all action, and upon a recognition of them alone can free institutions be maintained. These inherent rights have never been more happily expressed than in the Declaration of Independence, that new evangel of liberty to the people: " We hold these truths to be self-evident "—that is so plain that their truth is recognized upon their mere statement—"that all men are

endowed "—not by edicts of Emperors, or decrees of Parliament, or acts of Congress, but " by their Creator with certain inalienable rights "—that is, rights which cannot be bartered away, or given away, or taken away except in punishment of crime—" and that among these are life, liberty, and the pursuit of happiness, and to secure these "—not grant them but secure them—" governments are instituted among men, deriving their just powers from the consent of the governed."

Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment.

The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must, therefore, be free in this country to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright.

It has been well said that, " The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper." Adam Smith's Wealth of Nations, Bk. I. Chap. 10.

In this country it has seldom been held, and never in so odious a form as is here claimed, that an entire trade and busi-

ness could be taken from citizens and vested in a single corporation. Such legislation has been regarded everywhere else as inconsistent with civil liberty. That exists only where every individual has the power to pursue his own happiness according to his own views, unrestrained, except by equal, just, and impartial laws. The act of Louisiana compelled more than a thousand persons to abandon their regular business, and to surrender it to a corporation to which was given an exclusive right to pursue it for twenty-five years. What was lawful to these thousand persons the day before the law took effect was unlawful the day afterwards. With what intense indignation would a law be regarded that should, in like manner, turn over the common trades of the community to a single corporation. I cannot believe that what is termed in the Declaration of Independence a God-given and an inalienable right can be thus ruthlessly taken from the citizen, or that there can be any abridgment of that right except by regulations alike affecting all persons of the same age, sex, and condition. It cannot be that a State may limit to a specified number of its people the right to practise law, the right to practise medicine, the right to preach the gospel, the right to till the soil, or to pursue particular business or trades, and thus parcel out to different parties the various vocations and callings of life. The first section of the Fourteenth Amendment was, among other things, designed to prevent all discriminating legislation for the benefit of some to the disparagement of others, and when rightly enforced as other prohibitions upon the State, not by legislation of a penal nature, but through the courts, no one will complain. The disfranchising provisions of the third section naturally created great hostility to the whole amendment. They were regarded by many wise and good men as impolitic, harsh, and cruel; and the manner in which the first section has been enforced by penal enactments against legislators and governors has engendered widespread and earnest hostility to it. Communities, like individuals, resent even favors ungraciously bestowed. The appropriate mode of enforcing the amendment is, in my judgment, that which has been applied to other previously existing constitutional prohibitions, such as the one against a State pass-

ing a law impairing the obligation of contracts, or a bill of attainder, or an *ex post facto* law. The only provisions deemed necessary to annul legislation of this kind have been such as facilitated proceedings for that purpose in the courts; no other can be appropriate against the action of a State. Thus enforced there would be little objection to the provisions of the first section of the amendment. No one would object to the clause forbidding a State to abridge the privileges and immunities of citizens of the United States, that is, to take away or impair their fundamental rights. No one would object to the clause which declares that no State shall deprive any person of life, liberty, or property without due process of law, nor to the provision which declares that no State shall deny to any person within its jurisdiction the equal protection of the laws. If the first section of the amendment is thus applied as a restriction against the impairment of fundamental rights, it will not transfer to the federal government the protection of all private rights, as is sometimes supposed, any more than the inhibition against impairing the obligation of contracts transfers to the federal government the cognizance of all contracts. It does not limit the subjects upon which the States can legislate. Upon every matter, in relation to which previously to its adoption they could have acted, they may still act. They can now, as then, legislate to promote health, good order and peace, to develop their resources, enlarge their industries, and advance their prosperity. It only inhibits discriminating and partial enactments, favoring some to the impairment of the rights of others. The principal, if not the sole, purpose of its prohibitions is to prevent any arbitrary invasion by State authority of the rights of person and property, and to secure to every one the right to pursue his happiness unrestrained, except by just, equal, and impartial laws.

The first section of the amendment is stripped of all its protective force, if its application be limited to the privileges and immunities of citizens of the United States as distinguished from citizens of the States, and thus its prohibition be extended only to the abridgment or impairment of such rights, as the right to come to the seat of government, to secure any claim

they may have upon that government, to transact any business with it, to seek its protection, to share its offices, to engage in administering its functions, to have free access to its seaports, to demand its care and protection over life, liberty, and property on the high seas, or within the jurisdiction of a foreign government, the right to peaceably assemble and petition for redress of grievances, and the right to use the navigable waters of the United States, which are specified in the opinion in the Slaughter-House Cases as the special rights of such citizens. If thus limited, nothing was accomplished by adopting it. The States could not previously have interfered with th~ ? privileges and immunities, or any other privileges and immu ities which citizens enjoyed under the Constitution and laws ( the United States. Any attempted impairment of them cou have been as successfully resisted then as now. The Constitution and laws of the United States were as much then as now the supreme law of the land, which all officers of the State governments were then, as now, bound to obey.

Whilst, therefore, I fully concur in the decision of the court that it was entirely competent for the State to annul the monopoly features of the original act incorporating the plaintiff, I am of opinion that the act, in creating the monopoly in an ordinary employment and business, was to that extent against common right and void.

BRADLEY, J. (with whom agree HARLAN and WOODS, JJ.), concurring.

I concur in the judgment of the court in this case, reversing the judgment of the Circuit Court. I think that the act of the Legislature of Louisiana incorporating The Crescent City Live-Stock Landing and Slaughter-House Company, and granting to said company for twenty-five years the exclusive right to erect and maintain stock-landings and slaughter-houses within the limits of the parishes of Orleans, Jefferson, and St. Bernard, was not a valid contract, binding upon the State of Louisiana and protected by the Constitution of the United States from alteration or repeal; but my reasons for this opinion are different from those stated in the opinion of the court. They are

not based on the ground that the act was a police regulation. The monopoly clause in the act was clearly not such. It had nothing of the character of a police regulation. That part of the act which regulated the position on the river, relatively to the city of New Orleans, in which slaughter-houses and stock-landings should be built, was a police regulation, proper and necessary to prevent the offal of such establishments from floating in the water in front of the city. But such a regulation could be complied with by any butcher erecting a slaughterhouse, or by any wharfinger erecting a stock-landing; and so could every other real police regulation contained in the act. The police regulations proper were hitched on to the charter as a pretext. The exclusive right given to the company had nothing of police regulation about it whatever. It was the creation of a mere monopoly, and nothing else; a monopoly without consideration and against common right; a monopoly of an ordinary employment and business, which no legislature has power to farm out by contract. Suppose a law should be passed forbidding the erection of any bakery, or brewery, or soap manufactory within the fire district, or any other prescribed limits in a large city;—that would clearly be a police regulation; but would it be a police regulation to attach to such a law the grant to a single corporation or person of the exclusive right to erect bakeries, breweries, or soap manufactories at any place within ten miles of the city? Every one would cry out against it as a pretence and an outrage.

I hold it to be an incontrovertible proposition of both English and American public law, that all *mere* monopolies are odious and against common right. The practice of granting them in the time of Elizabeth came near creating a revolution. But Parliament, then the vindicator of the public liberties, intervened and passed the act against monopolies. 21 Jac. I. c. 3. The courts had previously, in the last year of Elizabeth, in the great *Case of Monopolies*, 11 Rep. 84 *b*, decided against the legality of royal grants of this kind. That was only the case of the sole privilege of making cards within the realm; but it was decided on the general principle that all monopoly patents were void both at common law and by statute, unless granted to the

introducer of a new trade or engine, and then for a reasonable time only; that all trades, as well mechanical as others, which prevent idleness, and enable men to maintain themselves and their families, are profitable to the commonwealth, and therefore the grant of the sole exercise thereof is against not on y the common law, "but the benefit and liberty of the subject." It was in view of this decision, and in accordance with the principles established by it, that the act of 21 James I. was passed abolishing all monopolies, with the exception of "letters patent and grants of privileges, for the term of fourteen years or under, of the sole working or vending of any manner of new manufactures to the true and first inventor and inventors of such manufactures, which others, at the time of making such letters patent and grants shall not use." As a mere declaration of the common and statute law of England, the case of Monopolies, and the act of 21 James I. would have but little influence on the question before us, which concerns the power of the legislature of a State to create a monopoly. But those public transactions have a much greater weight than as mere declarations and enactments of municipal law. They form one of the constitutional landmarks of British liberty, like the Petition of Right, the Habeas Corpus act, and other great constitutional acts of Parliament. They established and declared one of the inalienable rights of freemen which our ancestors brought with them to this country. The right to follow any of the common occupations of life is an inalienable right; it was formulated as such under the phrase "pursuit of happiness" in the Declaration of Independence, which commenced with the fundamental proposition that "all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and *the pursuit of happiness.*" This right is a large ingredient in the civil liberty of the citizen. To deny it to all but a few favored individuals, by investing the latter with a monopoly, is to invade one of the fundamental privileges of the citizen, contrary not only to common right, but, as I think, to the express words of the Constitution. It is what no legislature has a right to do; and no contract to that end can be binding on subsequent legislatures.

I do not mean to say that there are no exclusive rights which can be granted, or that there are not many regulative restraints on civil action which may be imposed by law. There are such. The granting of patents for inventions, and copyrights for books, is one instance already referred to. This is done upon a fair consideration and upon grounds of public policy. Society gives to the inventor or author the exclusive benefit for a time of that which, but for him, would not, or might not, have existed; and thus not only repays him, but encourages others to apply their powers for the public utility. So, an exclusive right to use franchises, which could not be exercised without legislative grant, may be given; such as that of constructing and operating public works, railroads, ferries, &c. In such cases a part of the public duty is farmed out to those willing to undertake the burden for the profits incidentally arising from it. So, licenses may be properly required in the pursuit of many professions and avocations which require peculiar skill or supervision for the public welfare. But in such cases there is no real monopoly. The profession or avocation is open to all alike who will prepare themselves with the requisite qualifications, or give the requisite security for preserving public order; except in certain cases, such as the sale of intoxicating drinks, where the interests of society require regulation as to the number of establishments as well as the character of those who carry them on. All such regulations as are here enumerated are entirely competent to the legislature to make. But this concession does not in the slightest degree affect the proposition (which I deem a fundamental one), that the ordinary pursuits of life, forming the large mass of industrial avocations, are and ought to be free and open to all, subject only to such general regulations, applying equally to all, as the general good may demand; and the grant to a favored few of a monopoly in any of these common callings is necessarily an outrage upon the liberty of the citizen as exhibited in one of its most important aspects—the liberty of pursuit.

But why is such a grant beyond the legislative power, and contrary to the Constitution?

The Fourteenth Amendment of the Constitution, after de-

claring that all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside, goes on to declare that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

I hold that a legislative grant, such as that given to the appellees in this case, is an infringement of each of these prohibitions. It abridges the privileges of citizens of the United States; it deprives them of a portion of their liberty and property without due process of law; and it denies to them the equal protection of the laws.

1. I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States. It was held by a majority of the court in the former decision of the *Slaughter-House Cases*, 16 Wall. 36, 57, that the "privileges and immunities of citizens of the United States" mentioned and referred to in the Fourteenth Amendment, are only those privileges and immunities which were created by the Constitution of the United States, and grew out of it, or out of laws passed in pursuance of it. I then held, and still hold, that the phrase has a broader meaning; that it includes those fundamental privileges and immunities which belong essentially to the citizens of every free government, among which Mr. Justice Washington enumerates the right of protection; the right to pursue and obtain happiness and safety; the right to pass through and reside in any State for purposes of trade, agriculture, professional pursuits or otherwise; to claim the benefit of the writ of *habeas corpus;* to institute and maintain actions of any kind in the courts of the State; and to take, hold, and dispose of property, either real or personal. *Corfield* v. *Corryell*, 4 Wash. C. C. 371, 381. These rights are different from the concrete rights which a man may have to a specific chattel or a piece of land, or to the performance by another of a particular contract, or to

damages for a particular wrong, all which may be invaded by individuals; they are the capacity, power, or privilege of having and enjoying those concrete rights, and of maintaining them in the courts, which capacity, power, or privilege can only be invaded by the State. These primordial and fundamental rights are "the privileges and immunities of citizens," which are referred to in the Fourth Article of the Constitution and in the Fourteenth Amendment to it. In the former it is declared that "the citizens of each State shall be entitled to ALL PRIVILEGES AND IMMUNITIES OF CITIZENS in the several States;" that is, in the other States. It was this declaration which Justice Washington was expounding when he defined what was meant by "privileges and immunities of citizens." The Fourteenth Amendment goes further, and declares that "no State shall abridge the privileges and immunities of citizens of the United States;" which includes the citizens of the State itself, as well as the citizens of other States.

In my opinion, therefore, the law which created the monopoly in question did abridge the privileges of all other citizens, when it gave to the appellees the sole power to have and maintain stock-landings and slaughter-houses within the territory named, because these are among those ordinary pursuits and callings which every citizen has a right to follow if he will, subject, of course, to regulations equally open to all.

2. But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it,—it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen. And, if a man's right to his calling is property, as many maintain, then those who had already adopted the prohibited pursuits in New Orleans, were deprived, by the law in question, of their property, as well as their liberty, without due process of law.

3. But still more apparent is the violation, by this monopoly law, of the last clause of the section—"no State shall deny to any person the equal protection of the laws." If it is not a

denial of the equal protection of the laws to grant to one man, or set of men, the privilege of following an ordinary calling in a large community, and to deny it to all others, it is difficult to understand what would come within the constitutional prohibition.

Monopolies are the bane of our body politic at the present day. In the eager pursuit of gain they are sought in every direction. They exhibit themselves in corners in the stock market and produce market, and in many other ways. If by legislative enactment they can be carried into the common avocations and callings of life, so as to cut off the right of the citizen to choose his avocation, the right to earn his bread by the trade which he has learned; and if there is no constitutional means of putting a check to such enormity, I can only say that it is time the Constitution was still further amended. In my judgment, the present Constitution is amply sufficient for the protection of the people if it is fairly interpreted and faithfully enforced.