L. N. Dantzler Lumber Co. *v.* Texas & P. Ry. Co. et al.

[80 South. 770, Division B.]

1. States. *Powers. Relation to United States.*
    Under section 10 of the amendments of the Constitution of the United States, all powers not granted to the national government and not prohibited to the states are reserved to the states respectively or to the people. Under this provision, the supreme court of the United States had decided that all powers relating merely to municipal legislation or to internal police are not surrendered by the states and in relation to these, the powers of a state are unqualified and exclusive.

2. RAILROADS. *Federal control. Jurisdiction of state courts.*
   The act of Aug. 29, 1916, section 1 (U. S. Comp. St. 1918, section 1974A), Act March 21, 1918, sections 10-13-15 (U. S. Comp. Stat. 1918, sections 3115 3-4j, 3115 3-4m, 3115 3-4o), and presidential proclamation of December 26, 1918, and April 11, 1918, did not prohibit state courts from entertaining jurisdiction and proceeding to judgment in all cases against railroads as heretofore; the only purpose being to prevent states from seizing property necessary to be used in the maintenance of the transportation system of the country for the use of the national government.

3. RAILROADS. *Federal control. Jurisdiction of state courts. Word "mesne."*
   Under the Act of August 29, 1916, section 1 (U. S. Comp. St. 1918, section 1974a), Act of March 21, 1918, sections 10-13-15 (U. S. Comp. St. 1918, sections 3115 3-4j, 3115 3-4m, 3115 3-4o), and the presidential proclamation of December 26, 1918, and April 11, 1918, state courts could entertain jurisdiction of actions against a non-resident railroad wherein a debt owing defendant by a railroad running through this state was, whether or not an execution could be levied. The proclamation of the president, prohibiting execution or other *mesne* process, does not prevent and was not intended to prevent a proceeding of the character here involved. The word *"mesne"* means intermediate, intervening; the middle between two extremes.

4. APPEAL AND ERROR. *Disposition of cause. Reversed in part.*
   Where the chancellor erroneously held that he had no jurisdiction, the supreme court, on reversing his decree, will not affirm as to a portion of defendants, on the theory that the cause having been set down for hearing, less than four months after their answer was filed, the answer must be taken as true, but will reverse and remand in accordance with the law.

APPEAL from the chancery court of Harrison county. HON. W. M. DENNY, JR., Chancellor.

Bill for attachment by the L. N. Dantzler Lumber Company against the Texas & Pacific Railway Company and others. From a decree for defendants, complainants appeal.

The facts are fully stated in the opinion of the court.

*White & Ford,* for appellant.

*R. B. Mayes, Wells, May & Sanders, R. H. & J. H. Thompson, McDonald & Marshall* and *B. E. Eaton,* for appellees.

Etheridge, J., delivered the opinion of the court.

The appellant filed a bill for attachment in the chancery court under section 536, Code of 1906 (section 293, Hemingway's Code), against the Texas & Pacific Railway Company, a foreign corporation operating between Ft. Worth, Tex., and Shreveport, La., and against the Vicksburg, Shreveport & Pacific Railroad Company, a railway corporation operating between Shreveport, La., and Vicksburg, Miss., the Alabama & Vicksburg Railway Company, the Louisville & Nashville Railroad Company, the Gulf & Ship Island Railroad Company, the Yazoo & Mississippi Valley Railroad Company, the Illinois Central Railroad Company, and the Mobile & Ohio Railroad Company, alleging that on the 10th day of October, 1917, the Texas & Pacific Railway Company agreed with complainant, in consideration of a freight rate paid therefor, to transport for the complainant from Ft. Worth, Tex., to Howison, Miss., ten carloads of cattle, the property of the complainant, and issued bill of lading therefor; that the cattle were transported over the Texas & Pacific Railway to Shreveport, La., and over the Vicksburg, Shreveport & Pacific Railroad to Vicksburg, over the Alabama & Vicksburg Railway to Jackson, Miss., and over the Gulf & Ship Island Railroad to Howison, Miss.; that said cattle were unreasonably delayed in transportation, having been in transportation, for one hundred, ten and one-half hours, and they were only fed twice during the said period of time; that they were roughly handled in transit by the Texas & Pacific Railway Company, and roughly handled to a certain extent by all the other carriers over which they moved, and as a result said cattle were injured and died in

transit to the value of six hundred dollars, and other cattle were damaged in the sum of five thousand, six hundred dollars; and that by said damage a number of cattle died after being unloaded, and others were so injured and diseased that it took expensive treatment for them to recover from said injuries.· It was alleged in the ·bill that the Louisville & Nashville Railroad Company, the Illinois Central Railroad Company, the Yazoo & Mississippi Valley Railroad Company, and the Mobile & Ohio Railroad Company,· and also the carriers over which the shipment moved, were indebted unto the Texas & Pacific Railroad Company, and will be further indebted to said defendant in the future, and pending the trial of this cause, and process was brought against each of defendants to answer said bill and to disclose in what sums and in what amounts each were indebted to the Texas & Pacific Railway Company. This bill was filed March 25, 1918, and summons issued to all the defendants, except the Texas & Pacific Railway Company, for which publication was made.

The defendants severally answered the bill, the Illinois Central Railroad Company, the Louisville & Nashville Railroad Company, the Yazoo & Mississippi Valley Railroad Company, and the Mobile & Ohio Railroad Company (being garnishees alone). Each, except the Mobile & Ohio Railroad Company, answered that they were not indebted to the Texas & Pacific Railway Company, but, on the contrary, that the said Texas & Pacific Railway Company was indebted to said garnishees. The Mobile & Ohio Railroad answered the bill, admitting an indebtedness on the 31st day of March, 1918, as follows: Unpaid vouchers, one thousand, one hundred forty-nine dollars and seventy-seven cents; interline ticket account, one hundred, fifty-one dollars and fifty-four cents; car service, nine hundred, eighty-three dollars and twenty cents; freight claims, forty-three dollars and sixty-eight cents—total, on March 31, 1918, two thousand, two hundred, thirty-

two dollars and nineteen cents; and that, accruing from March 31 to April 30, 1918, there were unpaid vouchers two thousand, two hundred twenty-seven dollars and sixty-four cents; interline ticket account, one hundred nine dollars and seventeen cents; car service, six hundred sixty-one dollars and thirty-five cents; freight claims, fifty-five dollars and seventy-eight cents.

The answer of the defendant Mobile & Ohio Railroad Company set up:

That the respondent Mobile & Ohio Railroad Company is a corporation which was, until the 26th day of December, 1917, engaged in operating a railroad, a part of which was within the state of Mississippi; that on said date the President of the United States issued a proclamation and took possession and assumed control for the government of the United States of the transportation systems of the United States, including all of the property of the Mobile & Ohio Railroad Company and of the defendant Texas & Pacific Railway Company, used in transportation as common carriers, and the said proclamation was in part as follows:

"Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers."

That the Congress of the United States ratified the said act of the President of the United States and provided for the control and operation of the railroads of the United States, including the property of the Mobile & Ohio Railroad Company and of the Texas & Pacific Railway Company by an act approved March 21, 1918, chapter 25, 40 Stat.—(U. S. Comp. St. 1918, sections 3115¾a-3115¾p), entitled:

"An act to provide for the operation of transportation systems while under federal control, for the just compensation of their owners and for other purposes."

That by section 10 of the said act (section 3115¾j) it was provided:

"But no process, mesne or final, shall be levied against any property under such federal control."

It further alleged that any money that may be due from the Mobile & Ohio Railroad Company to the Texas & Pacific Railway Company since the service of the writ upon the Mobile & Ohio Railroad Company is property under the control of the federal government, within the meaning of the said proclamation of the President and the said act of Congress, under the orders of the Director General of Railroads. It is alleged further that the company was made a party simply as a garnishee, in order that any indebtedness of this defendant to the Texas & Pacific Railway Company might be condemned to pay the demand of the complainant against the Texas & Pacific Railway Company, and alleged that the writ served on this defendant for that purpose is mesne process within the meaning of the said act of Congress, and was in violation of law and void.

The defendant, after filing this answer, moved the court to dismiss the proceeding as to the Mobile & Ohio Railroad Company and discharge it, which motion the trial judge sustained. The Texas & Pacific Railway Company did not answer, and decree *pro confesso* was taken, and proof of the amount of damage introduced. The Gulf & Ship Island, Alabama & Vicksburg, and Vicksburg, Shreveport & Pacific Railroad Companies denied the allegations of the bill so far as their respective handling of the cattle is concerned, and answered that they had no information as to the allegations against the Texas & Pacific Railway Company, except that they say that the delay in transportation was not unreasonable. After the court dismissed the case against the Mobile & Ohio Railroad, the complainant moved for judgment against the Vicksburg, Shreveport & Pacific, Texas & Pacific, Alabama &

Vicksburg, and Gulf & Ship Island Railroad Companies; but the court below held that it had no jurisdiction, and dismissed the bill. From this judgment the L. N. Dantzler Lumber Company appealed here.

The principal question for determination is whether or not the Mobile & Ohio Railroad Company could be garnished as a foundation to sustain the attachment against the Texas & Pacific Railway Company; no other property belonging to the Texas & Pacific Railway Company than this indebtedness of the Mobile & Ohio Railroad Company being found in the state. The bill was filed on the 25th day of March, 1918, and the garnishment served on the Mobile & Ohio Railroad Company on the same date.

On the 29th of August, 1916, Congress enacted a law, one section of which only is pertinent to this cause, which reads as follows:

"Control of Transportation Systems in Time of War. —The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." 39 Statutes at Large, 645, chapter 418, section 1 (U. S. Comp. St. 1918, Compact Edition, p. 274).

On the 26th day of December, 1918, the President issued a proclamation, reciting that it had become necessary in the national defense to take possession and assume control of certain systems of transportation and to utilize the same, to the exclusion so far as may be necessary of all other traffic thereon, for the transportation of troops, war material, and equipment therefor, and for other needful and desirable purposes connected

with the prosecution of the war. In this proclamation is found the following:

"Until and except so far as said Director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission, and to all statutes and orders of regulating commissions of the various states in which said systems or any part thereof may be situated. But any orders, general or special, hereafter made by said Director, shall have paramount authority and be obeyed as such."

On the 11th day of April, 1918, the President issued another proclamation, taking possession and assuming control, through Acting Secretary of War, at 12:01 a. m. on the 13th day of April, 1918, of each and every system of transportation, naming certain steamship and other transportation companies, to be exercised under the direction and control of William G. McAdoo, Director General of Railroads. After the promulgation of these orders or proclamations of the President, based upon the statute above quoted, the different transportation companies took the position that the railroads were under the control of the government and that they had the right to remove causes to the federal courts and that they could not be sued without the consent of the United States. On the 21st of March, 1918, by 40 Statutes at Large, chapter 25, Congress passed an additional act dealing with the subject of governmental control of railroads and other transportation concerns. In section 10 of said act of March 21, 1918, section 3115¾j (U. S. Comp. St. 1918, Compact Edition, p. 458), it is provided:

"Liabilities of Carriers; Actions By and Against. —Carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the pro-

visions of this act or any other act applicable to such
federal control or with any order of the President.
Actions at law or suits in equity may be brought by and
against such carriers and judgments rendered as now
provided by law; and in any action at law or suit in
equity against the carrier, no defense shall be made
thereto upon the ground that the carrier is an instru-
mentality or agency of the federal government.   Nor
shall any such carrier be entitled to have transferred
to a federal court any action heretofore or hereafter
instituted by or against it, which action was not so
transferable prior to the federal control of such carrier;
and any action which has heretofore been so transferred
because of such federal control or of any act of Con-
gress or official order or proclamation relating thereto
shall upon motion of either party be retransferred to
the court in which it was originally instituted.   But
no process, mesne or final, shall be levied against any
property under such federal control."

In section 13, chapter 25, 40 Statutes at Large (U. S.
Comp. St. 1918, Compact Edition, section 3115¾m, p.
459), it is provided:

"Pending Cases Against Carriers.—All pending cases
in the courts of the United States affecting railroads
or other transportaton systems brought under the act
to  regulate  commerce,  approved  February  fourth,
eighteen hundred and eighty-seven, as amended and
supplemented,  including  the  commodities  clause,  so
called, or under the act to protect trade and commerce
against unlawful restraints and monopolies, approved
July second, eighteen hundred and ninety, and amend-
ments  thereto,  shall  proceed  to  final  determination
as soon as may be, as if the United States has not as-
sumed control of transportation systems; but in any
such case the court having jurisdiction may, upon the
application of the United States, stay execution of
final judgment or decree until such time as it shall
deem proper."

Section 15, chapter 25, 40 Statutes at Large, of the Act of March 21st, 1918 (section 3115¾o, U. S. Comp. St. 1918, Compact Edition, p. 459), provides:

"Existing Laws or Powers of States.—Nothing in this act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds."

It will be noted from the sections above quoted of the Act of March 21, 1918, that while under federal control, the carriers shall be subject to all laws and liabilities as common carriers whether arising under state or federal laws or at common-law, except so far as may be inconsistent with the provisions of this act, or with any order of the President, and that actions may be brought against such carriers and judgment rendered as now provided by law; and that in any action at law, or suit in equity, against the carrier no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. It will be seen from an analysis of this provision that the carrier when sued is forbidden to set up the very defense it attempts to set up in this case. Such defense can only be made by the Director General intervening.

By referense to section 15, above quoted from it is provided that nothing in this act shall be construed to to amend, repeal, impair, or affect the existing law or powers of the states in relation to taxation or the lawful police regulation of the several states except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds. It is clear from this section that it was not the purpose of Congress in enacting these laws to displace the state control any

119 Miss.—22.

further than was necessary to enable the government to carry on war activities, transporting the troops, war materials, government supplies, and issuance of bonds. In all other respects it was the intent of Congress to leave the laws of the states in full force. It is exceedingly doubtful whether Congress could enact laws that would prohibit states from administering relief in its courts to litigants, and it has been held by the United States Supreme Court that: In a state where "federal authority was always unopposed, . . . and its courts always open to hear criminal accusations and redress grievances, . . . no usage of war could sanction a military trial . . . for any offense whatever, of a citizen in civil life, in no wise connected with the military service. Congress could grant no such power."

The right of trial by jury is preserved to every one accused of crime, who is not attached to the army, or navy, or militia in actual service.

"Martial law cannot arise from a threatened invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration."

Again:

"By the protection of the law human rights are secured; withdraw that protection, and they are at the mercy of wicked rulers, or the clamor of an excited people. It there was law to justify this military trial, it is not our province to interfere; if there was not, it is our duty to declare the nullity of the whole proceedings. The decision of this question does not depend on argument or judicial precedents, numerous and highly illustrative as they are. These precedents inform us of the extent of the struggle to preserve liberty and to relieve those in civil life from military trials. The founders of our government were familiar with the history of that struggle, and secured in a written Constitution every right which the people had

wrested from power during a contest of ages. By that Constitution and the laws authorized by it this question must be determined.''

Again:

''These securities for personal liberty thus embodied, were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. And so strong was the sense of the country of their importance, and so jealous were the people that these rights, highly prized, might be denied them by implication, that when the original Constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified.

''Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper, and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers

granted to it, which are necessary to preserve its existence, as has been happily proved by the result of the great effort to throw off its just authority."

Again:

"But it is said that the jurisdiction is complete under the 'laws and usages of war.'

"It can serve no useful purpose to inquire what those laws and usages are, whence they originated, where found, and on whom they operate; they can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed. This court has judicial knowledge that in Indiana the federal authority was always unopposed, and its courts always open to hear criminal accusations and redress grievances; and no usage of war could sanction a military trial there for any offense whatever of a citizen in civil life, in no wise connected with the military service. Congress could grant no such power; and to the honor of our national legislature be it said, it has never been provoked by the state of the country even to attempt its exercise. One of the plainest constitutional provisions was, therefore, infringed when Milligan was tried by a court not ordained and established by Congress, and not composed of judges appointed during good behavior."

Again:

"The discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common-law courts; and, in pursuance of the power conferred by the Constitution, Congress has declared the kinds of trial, and the manner in which they shall be conducted, for offenses committed while the party is in the military or naval service. Every one connected with these branches of the public service is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the

civil courts.   All other persons, citizens of states where
the courts are open, if charged with crime, are guar-
anteed the inestimable privilege of trial by jury.   This
privilege is a vital principle, underlying the whole ad-
ministration of criminal justice; it is not held by
sufferance, and cannot be frittered away on any plea
of state or political necessity.   When peace prevails,
and the authority of the government is undisputed, there
is no difficulty in preserving the safeguards of liberty;
for the ordinary modes of trial are never neglected, and
no one wishes it otherwise; but if society is disturbed
by civil commotion—if the passions of men are aroused
and the restraints of law weakened, if not disregarded
—these safeguards need, and should receive, the watch-
ful care of those intrusted with the guardianship of the
Constitution and laws.   In no other way can we trans-
mit to posterity unimpaired the blessings of liberty,
consecrated by the sacrifices of the Revolution.

"It is claimed that martial law covers with its broad
mantle the proceedings of this Military Commission.
The proposition is this:   That in a time of war the
commander of an armed force (if in his opinion the
exigencies of the country demand it, and of which he
is to judge) has the power, within the lines of his
military district, to suspend all civil rights and their
remedies, and subject citizens as well as soldiers to the
rule of his will; and in the exercise of his lawful
authority cannot be restrained, except by his superior
officer or the President of the United States.

"If this position is sound to the extent claimed, then
when war exists, foreign or domestic, and the country is
subdivided into military departments for mere con-
venience, the commander of one of them can, if he
chooses, within his limits, on the plea of necessity, with
the approval of the executive, substitute military force
for and to the exclusion of the laws, and punish all
persons, as he thinks right and proper, without fixed or
certain rules.

"The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guaranty of the Constitution, and effectually renders the 'military independent of and superior to the civil power'—the attempt to do which by the king of Great Britain was deemed by our fathers such an offense, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable and, in the conflict, one or the other must perish.

"This nation, as experience has proved, cannot always remain at peace, and has no right to expect that it will always have wise and humane rulers, sincerely attached to the principles of the Constitution. Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right is conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate. If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them. They knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen. For this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written Constitution the safeguards which time had proved were essential to its preservation. Not one of these safeguards can the President, or Congress, or the judiciary disturb, except the one concerning the writ of habaes corpus."

Again:

"The illustrious men who framed that instrument were guarding the foundations of civil liberty against the abuses of unlimited power; they were full of wisdom, and the lessons of history informed them that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting the citizen against oppression and wrong. Knowing this, they limited the suspension to one great right, and left the rest to remain forever inviolable. But, it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation. Happily, it is not so."

Again:

"Martial law cannot arise from a threatened invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration." *Ex parte Milligan,* 4 Wall. 2, 18 L. Ed. 281 et seq.

The war powers of national government have been elaborately discussed by the United States supreme court in the *Milligan Case, supra;* *Texas* v. *White,* 7 Wall. 700, 19 L. Ed. 227 et seq.; *Ex parte Lange,* 18 Wall. 163, 21 L. Ed. 875; *Ochoa* v. *Morales,* 230 U. S. 139, 33 Sup. Ct. 1033, 57 L. Ed. 1427.

Under section 10 of the Amendments of the Constitution of the United States, all powers not granted to the national government and not prohibited to the states are reserved to the states respectively or to the people. Under this provision it has been decided by the United States supreme court that all powers relating merely to municipal legislation or to internal police are not surrendered by the states, and in relation to these the power of a state is unqualified and exclusive (*New York* v. *Miln,* 11 Pet. 102, 9 L. Ed. 648; *United*

*States* v. *Cruikshank,* 92 U. S. 542, 23 L. Ed. 588; *Butchers' Union, etc., Co.* v. *Crescent City Live Stock, etc., Co.,* 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585); that the purpose of this amendment is to put beyond all dispute that the powers not granted by the Constitution to the federal government are reserved to the people (*Kansas* v. *Colorado,* 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956). It has often been said that this government is a government of divided powers, those powers of a national character being vested in the national government, and all other powers vested in the state government; that this country is now, has been, and must be "an indestructible Union of indestructible states."

Construing the statutes above quoted from, and the proclamation of the President, in connection with the decisions of the supreme court, we are bound to conclude that it was not the purpose of either the President or Congress to prohibit the state courts from entertaining jurisdiction and proceeding to judgment in all cases as heretofore, but that the only purpose was to prevent states from seizing property necessary to be used in the maintenance of the transportation system of the country for the use of the national government.

In the case before us there is no effort to impair the railroad service by taking any of the property used in operation of railroads, and specially for the purposes named in the statutes above quoted from, and it is therefore unnecessary to say whether an execution could be levied or not. No effort is here made to levy an execution against the property used in transportation, but the garnishment here merely brings the Mobile & Ohio Railroad Company into court to answer whether it is indebted to the Texas & Pacific Railway Company, and, if so, that the court may render proper judgment fixing the rights of the parties with reference to such fund, but does not involve the seizure of any

money or other property in such way as to interfere with the Director General's direction of the railroads.

The proclamation of the President, prohibiting execution or other mesne process, does not prevent, and was not intended to prevent, a proceeding of the character here involved. The word "mesne" means intermediate; intervening; the middle between two extremes. Black's Dictionary. As defined by the circuit court of the United States in *Moredock* v. *Kirby,* 118 Fed. 180, at page 185, Judge EVANS, in delivering this opinion, says:

"In *Goldey* v. *Morning News,* 156 U. S. 519, 15 Sup. Ct. 559, 39 L. Ed. 517, allusion is made by the court to the service of 'mesne process' upon the 'authorized agent' of a defendant, but mesne process and original process and final process are very different things. Bouvier, in his Law Dictionary, defines the former by saying that 'process which is issued in a suit between the original and final process is called "mesne process."' The court, of course, used the word advisedly, and had nothing in view except an interlocutory notice, or something of a kindred nature."

The fifteenth section of chapter 25, 40 Statutes at Large (Act March 21, 1918), in express terms reserves the lawful police regulations in the several states, except as to regulations which may affect the transportation of troops, war material, government supplies, or the issuance of bonds. This recognition of police regulations means to reserve to the states all the police power of the state unimpaired, except as to the subjects excepted in the statute, and in volume 6, Words and Phrases (1st Ed.) p. 5438, we find the following:

"Police regulations are such provisions of law as are designed to protect the lives, limbs, health, comfort, and quiet of citizens, and secure them in the enjoyment of their property, which can be invoked only for an interference with one's dominion over his own property to prevent such use of it by him, or its con-

tinuance in such conditions as would be detrimental to the community.''

Again:

''Laws and ordinances relating to the safety, comfort, health, convenience, good order, and general welfare of the inhabitants are styled 'police regulations.' ''

In Cooley on Constitutional Limitations, star page 574, we find the following definition by that distinguished author:

''In the American constitutional system, the power to establish the ordinary regulations of police has been left with the individual states, and cannot be assumed by the national government. Neither can the national government, through any of its departments or officers, assume any supervision of the police regulations of the states, so long as they do not invade the sphere of national sovereignity, and obstruct or impede the exercise of any authority which the Constitution has confided to the nation.''

It is unnecessary now to decide whether an execution could issue after final judgment or not. That question can be decided when it arises properly. We are satisfied that it was not the meaning of Congress, nor of the President, to undertake to prohibit the states from administering justice and to compel the discharge of lawful obligations or to protect private rights. It is clear to us that the garnishee is not entitled to plead the question presented by its answer in this cause, and that it was the purpose of Congress to prohibit these questions being presented by the railroads. It is presumed that, when the judgment is established in a court of competent jurisdiction, that the Director General operating the carriers, will discharge such obligations against such carriers, or permit such carriers to do so without question. We are satisfied that Congress and the President did not intend to suspend the collection of debts against carriers, or to grant the

carriers immunity from judgments and the payment of their own obligations.

We think the learned court below erred in discharging the Mobile & Ohio Railroad Company as garnishee, and in holding that it had no jurisdiction to proceed to determine the controversy before it.

It is urged here, by the appellees Vicksburg, Shreveport & Pacific Railroad and the Alabama & Vicksburg Railway, that the judgment should be affirmed as to them, because the cause was set down for hearing less than four months after the answer was filed, and therefore the answer must be takn as true. Inasmuch as the chancellor held that he had no jurisdiction, we think the cause should be reversed and remanded in accordance with law, and the case is accordingly reversed and remanded.

*Reversed and remanded.*

STEVENS, J., took no part in the consideration and decision of this case.